IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

XP VEHICLES, INC., a California Corporation,   )
1001 Bridgeway, #166   )
Sausalito, CA  94965   )
   )
and   )
   )
LIMNIA, INC., a Delaware Corporation,   )
601 Van Ness Ave., Suite E3 613   )
San Francisco, CA 94102   )
   )
       Plaintiffs,   )
   )   Case No. _____
v.   )
   )
THE UNITED STATES DEPARTMENT OF   )
ENERGY, 1000 Independence Avenue, SW   )
Washington, DC 20585;   )
   )
STEVEN CHU,   )
individually and in his official capacity   )
as Secretary of Energy; and   )
   )
LACHLAN SEWARD,   )
individually and in his official capacity   )
as Director of Advanced Technology Vehicle   )
Manufacturing Loan Program,   )
United States Department of Energy,   )
   )
       Defendants.   )
_____ )

VERIFIED COMPLAINT
(For Due Process Violations and Administrative Procedure Act
Declaratory and Injunctive Relief)

**Parties**

1.     Plaintiff XP VEHICLES, INC. ("XPV"), a dissolved California corporation, was

at all times relevant an advanced technology vehicle company.  XPV has the capacity and

authority to sue Defendants pursuant to Cal. Corp. Code §§ 2010, 2001, and Fed. R. Civ. P. 17(b)(2).  It is a real party in interest under Fed. R. Civ. P. 17(a).

2. Plaintiff LIMNIA, INC. (f/k/a "FuelSell Technologies, Inc.") (collectively "Limnia"), is a Delaware corporation in good standing that was, at all times relevant, an advanced technology energy system company. It is a real party in interest under Fed. R. Civ. P. 17(a).

3. At all times relevant, XPV and Limnia were Silicon Valley-based innovative "green technology" sister companies.

4. Defendants are THE UNITED STATES DEPARTMENT OF ENERGY ("DOE"), a federal agency; Secretary of Energy STEVEN CHU ("Chu"), individually and in his official capacity; and DOE Director of Advanced Technology Vehicle Manufacturing Loan Program LACHLAN SEWARD ("Seward"), individually and in his official capacity.

### Jurisdiction, Venue and Declaratory Relief

5. Jurisdiction and venue are pursuant to U.S. Const. Art. III, 28 U.S.C. §§ 1331, 1346 and 1391, and the Administrative Procedure Act, 5 U.S.C. § 702.

6. This Court may grant declaratory relief and award attorney fees and costs pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. and 28 U.S.C. § 2412.

### Facts

Background

7. Pursuant to 42 U.S.C. § 17013, DOE—through Chu, Seward, their staff, advisors and consultants—administered the "Advanced Technology Vehicle Manufacturing Loan Program" (the "ATVM Loan Program").

8.      Congress created the ATVM Loan Program to support the manufacture of advanced technology vehicles and components in the United States and reduce U.S. dependency on foreign oil.  In 2008, Congress authorized DOE to make $25 billion in ATVM loans.  DOE currently has approximately $16 billion of unused lending authority.

9.      At all times relevant, Defendants had actual or constructive knowledge that the ATVM Loan Program evaporated private investment capital for advanced technology vehicle development because venture capital and institutional lenders could not compete with government interest and repayment terms (1%-3% and up to 35 years, respectively).

10.     Pursuant to 42 U.S.C. §§ 16511 and 16513, DOE through Chu, Seward, their staff, advisors and consultants also administered the "§1703 Loan Guarantee Program" (the "LGP")

11.     Congress created the LGP to support innovative clean energy technologies that are typically unable to obtain conventional private financing due to high technology risks by authorizing DOE to guarantee up to eighty percent of a loan for projects that "avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gases; and employ new or significantly improved technologies as compared to commercial technologies in service in the United States at the time the guarantee is issued."  DOE currently has approximately $34 billion of unused lending authority.

12.     Since 2002, Limnia and XPV have collaborated with DOE scientists at Sandia National Laboratory ("Sandia") and elsewhere on advanced technology vehicle development. Limnia and XPV provided DOE with confidential business information, intellectual property and prototypes of advanced technology vehicle energy storage systems, chassis and body materials

3

and construction, and electronics, and DOE provided Limnia and XPV a grant, technical support and validation services.

13.     At all times relevant, Defendants had actual and/or constructive knowledge of DOE's extensive advanced technology vehicle collaboration with Limnia and XPV.

<u>XPV's ATVM Loan Program Application</u>

14.     Responding to a DOE solicitation, on November 10, 2008, XPV applied for $40 million in ATVM Loan Program funds to mass produce an advanced technology, family-friendly SUV-style vehicle ("XPV's SUV").  It offered DOE collateral independently valued at over $100 million as security for this loan.

15.     At all times relevant, XPV had operations, including potential manufacturing facilities, in Detroit (through Roush Automotive and other contract facilities), the San Francisco Bay area, Nevada, and Utah.

16.     XPV's team included highly experienced industry sales executives, managers and designers (including the senior creation staff for the Corvette and the Mustang) and aerospace industry professionals.  They designed XPV's SUV to be affordable (less than $20,000 in its base configuration); to have a virtually unlimited range with a gasless, cordless charge; to rapidly recharge via a "hot-swap" system; to be produced quickly and cheaply by subcontracting existing and underutilized factories, workers and machines; and to be easily repaired.

17.     One key innovation, based on a decade of research, was the use of polymer plastics and skinned expanded foam pressure membranes to replace metal doors, body panels, hoods and roofs on a lightweight alloy frame. Consequently, XPV's SUV could have a curb weight of less than 1,400 pounds (approximately one-third the weight of a Toyota Prius).  This

design also improved vehicle safety because the foam-skinned polymer membranes functioned as a wraparound, pre-deployed "airbag" to withstand impacts and damp out crash damage.

18.    At all times relevant, XPV's SUV's critical parts had either been tested or used in industry-proven "off the shelf" applications.  For example, the SUV's pressure membrane body technology was widely used in military applications, aerospace systems, naval and homeland security deployments worldwide, airbags, watercraft, Mars landing equipment and even buildings and arenas.

19.    At all times relevant, XPV was in discussions with private sources of capital including Wells Fargo Bank; developing a distribution network; and otherwise preparing to commence production and sales.  XPV's pending customers and financial partners included the Ranson Green Community Development Foundation, ZAP, Detroit Electric, XPV's sister company Limnia and over forty distributors and resellers accounting for potential sales in excess of the first anticipated production run.

20.    XPV's ATVM Loan Program application contained confidential business information, as defined by 10 C.F.R §§ 1004.10(b)(4) and (11), and 5 U.S.C. § 552(b)(4), including a patented solid-state NaALH (aka "NALH") energy storage system and patented pressure membrane technology, among other things.

21.    Defendants, in nondisclosure agreements and in consideration for XPV's and Limnia's submission of ATVM Loan Program applications, promised to guard this information and prevent its unauthorized disclosure, use and infringement.  Defendants also promised to evaluate ATVM Loan Program applications on a "first in, first out" basis; to provide a level review using objective published criteria; and to make ATVM Loan Program funds available

beginning by the end of December 2008, but no later than January 2009, for those who qualified for such funds.

22.     On December 2, 2008, Seward acknowledged receipt of XPV's ATVM Loan Program application and requested additional information.  *See* <u>Exhibit 1</u>.  XPV provided this additional information and on December 31, 2008, Seward deemed XPV's application "substantially complete."  He said additional information would be requested if required during the review process.  *See* <u>Exhibit 2</u>.  Upon information and belief, XPV's ATVM Loan Program application was among the very first deemed substantially complete.

23.     At all times relevant, XPV qualified for ATVM Loan Program funds under DOE's published criteria and was, in fact, deemed a "qualified applicant" by Defendants. DOE's own Excel comparison matrices dated December 29, 2008, and March 2, 2009, placed XP in the top 5% of all applicants.

24.     Defendants' representations and promises led XPV to believe that DOE would begin processing XPV's ATVM Loan Program application upon receipt but no later than the end of December 2008, and that the review would take a matter of weeks, consistent with normal commercial lending practices and procedures.

25.     However, XPV soon found that Defendants had reneged on their promises and that the review was taking months not weeks.  Discomfited by the delay, which, due to Defendants' actions, blocked private capital loans and investment and prevented XPV from gearing up for production, XPV repeatedly offered Defendants engineering, financial and other information to proactively speed and inform its application review and approval.

26.     At all times relevant, XPV was unaware both that its ATVM Loan Program application had been "set aside" in favor of applications from politically-connected government

cronies and that Defendants had "fixed" the ATVM Loan Program process to benefit political

donors.  XPV also was unaware that Defendants had no intention of approving XPV's ATVM

Loan Program application (or the application of any other company without significant political

contributions or influential political patrons) under any circumstances, notwithstanding all of

their representations and assurances to the contrary, because XPV competed with government-

favored companies.  Instead, XPV assumed that Defendants were acting in good faith, and in

accordance with law, to carry out Congress's intent by lending up to $25 billion for the

development and production of advanced technology vehicles in the United States to reduce U.S.

dependency on foreign oil.

27.     On April 23, 2009, Jason Gerbsman, DOE's Chief of Staff and Senior Investment

Officer at the Loan Programs Office Automotive Division notified XPV that:

> [XPV] has submitted a substantially complete application and has been assigned
> to both a technical eligibility and merit review team, as well as a financial
> viability analysis team. The technical team is very close to finishing their
> evaluations on both eligibility and project merit, and the financial team will be
> launching a more detailed and interactive due diligence phase of the [XPV]
> application review very soon. Following the technical and financial evaluation
> under the second stage of the process, we will move into the underwriting phase
> where our goal is to negotiate a conditional commitment, including a detailed
> term sheet. This will be followed by the fourth phase of the loan process where
> the final details will be negotiated and the loan will be closed.

28.     On May 26, 2009, Gerbsman offered XPV an in-person meeting to discuss "next

steps."

29.     On May 28, 2009, XPV flew a representative from California to meet with

Gerbsman.  Gerbsman said that DOE had determined "everything was in order" with XPV's

ATVM Loan Program application; that "everything looked good"; and that XPV "appeared to be

fully compliant and passed technical review."

30.     Shortly thereafter, XPV discovered that Tesla Motors, Inc. ("Tesla") and Fisker

Motors, Inc. ("Fisker") were receiving special assistance from DOE staff with the ATVM Loan

Program application process.  Fisker was even given extraordinary access to DOE staff time,

offices and conference rooms in DOE's headquarters at no charge.  Both Tesla and Fisker were

XPV competitors.

31.     XPV requested similar assistance from DOE staff but was denied it because, as

DOE staff put it, XPV's application was so good that special assistance was unnecessary.

32.     Notwithstanding DOE's delays and the bankruptcy of other industry players (due

to these companies' failure to produce a product that met consumer needs), XPV continued to

grow throughout 2009.  On June 15, 2009, XPV informed DOE that it was a semi-finalist in the

Forbes "America's Most Promising Companies List" for 2009. In late June 2009, XPV had

occasion to speak with a corporate executive who was seeking DOE funds.  The executive said

that he had been "screwed over" by DOE and had wanted to know if others had similar

experiences.  He said that his company had suffered "bad dealings" with Matt Rogers, a

"stimulus advisor" to Chu from McKinsey & Company, and Steven Spinner, a DOE loan

program office official.  Spinner, an accomplished campaign contribution "bundler" who had

raised millions of dollars for the White House, was given this important government position in

exchange for his fundraising.  Spinner too had worked at McKinsey & Company and, according

to a biography posted by the Center for American Progress, was a Tesla advisor and investor.

33.     The executive claimed that Rogers and Spinner were playing favorites with

government money.  He gave XPV Spinner's personal cell phone number and told XPV to call

Spinner and ask why XPV's ATVM Loan Program application had stalled.  XPV texted Spinner

and then called him.  Spinner answered the phone and said words to the effect of "Do not ever call me again.  The awards have already been decided."

34.     On June 24, 2009, DOE announced that it was making $8 billion in ATVM Loan Program funds available to Ford Motor Company ("Ford"), Nissan North America, Inc. ("Nissan") and Tesla.  DOE gave Tesla $465 million of taxpayer funds at an interest rate of 1.6% and on extremely favorable, below-market terms to manufacture an expensive electric car targeted at rich actors, journalists and businessmen, not average Americans.

35.     On June 29, 2009, XPV wrote to Gerbsman again asking for action on its ATVM Loan Program application.  XPV told Gerbsman that other lenders were hanging back until after DOE issued its term sheets.

36.     Over the next seven weeks Gerbsman and other authorized DOE representatives repeatedly assured XPV that "everything was fine"; "everything is on-track"; and "you [XPV] appear to meet every criteria" with respect to its ATVM Loan Program application.  XPV was even told that "we [DOE] should be able to announce [a loan] any day now…"

37.     However, on August 21, 2009, Seward denied XPV's ATVM Loan Program application.  *See* Exhibit 3.

38.     Seward said XPV's application was "determined to be eligible" in accordance with the "evaluation criteria" in 10 C.F.R. § 611.103 but that DOE was "not in a position to award every eligible application [ATVM Loan Program funds]."  He also said necessity required DOE to "choose applications that are most likely to use [ATVM Loan Program] proceeds in a way that will best achieve the goals of the program" and that XPV's application was rejected on this basis after a "merit review."  Seward did not disclose the criteria DOE used to weigh competing qualified applications or explain how or why XPV fell short in the "merit review."

9

39.     XPV then asked DOE to specify its reasons for denial.

40.     In an email to DOE's Chris Foster, XPV requested DOE's merit review documents and asked how DOE could reasonably conduct a ten-month comparative merit review of XPV's ATVM Loan Program application without working with a single company engineer or senior project staff member for even one percent of the time that DOE staff spent with Tesla, Nissan, Ford and/or Fisker during the same period of time.

41.     Foster did not answer.

42.     On or about August 26, 2009, XPV called Foster directly and Foster picked up the phone.

43.     Foster told XPV that he would pull XPV's file and read to XPV the reasons given there for DOE's denial.

44.     Foster said that the file indicated that DOE had denied XPV's application because XPV's SUV did not use E85 gasoline; XPV was not planning on building "enough" vehicles; XPV was not planning on government sales; XPV's electric motors and batteries were too futuristic and not developed for commercial use; XPV's SUV was a "hydrogen car"; and XPV had underestimated the cost of metal body fabrication.

45.     At all times relevant, however, Defendants had actual knowledge that the "reasons" given for denying XPV's ATVM Loan Program application were baseless pretexts.

46.     First, none of the politically-connected ATVM Loan Program winners used E85 gasoline in all-electric vehicles.

47.     Second, XPV's SUV was designed for fast and inexpensive mass production. This is why it was based on the use of commonly available parts from existing commercial sources with multiple points of supply and why it could be sold at a base price of only $20,000.

Unlike the vehicles produced by the government crony companies funded by DOE, XPV's SUV was not merely a specialty product aimed at rich people seeking to make a social or political statement through their choice of vehicle. Instead, it was designed to be affordable and available to the vast majority of American families and consumers, thereby ensuring that there would be a mass market and a high volume of potential sales.

48.     Third, XPV's business plan specifically provided for large government and fleet sales.  Defendants were aware this plan had been developed by an experienced automotive fleet sales expert responsible for over $2 billion in sales for domestic automakers.

49.     Fourth, XPV's SUV's "futuristic" electric motor and battery configuration had been in commercial and government use for decades.

50.     Fifth, XPV's SUV was an electric and not a hydrogen vehicle.

51.     Sixth, XPV's SUV minimized the number of metal parts, using safer and easier to source and fabricate polymers and plastics.

52.     As XPV was explaining to Foster that the "reasons" given for denial were actually no reasons at all, Seward entered Foster's office and directed him to terminate the call.  Seward told Foster to advise XPV that it would receive a letter from DOE with respect to its concerns.

53.     Despite the passage of weeks, no letter was forthcoming.

54.     Therefore, on September 21, 2009, XPV wrote to Chu requesting reconsideration of DOE's ATVM Loan Program denial.  *See* Exhibit 4.  In this letter, XPV demonstrated that the "reasons" for DOE's denial read by Foster from XPV's file were false.  It asked Chu to explain why DOE staff repeatedly assured XPV that approval would be forthcoming and that no additional information was necessary; to describe the merit review criteria; and to justify why government cronies that applied for ATVM Loan Program funds after XPV were reviewed

earlier, given the benefit of extensive access to and interaction with DOE staff (a benefit denied to XPV), and then awarded funds.

55.     On October 23, 2009, Seward wrote to XPV.  *See* Exhibit 5.  He did not answer XPV's questions.  Instead, he attempted to backfill the record with new but equally baseless justifications for the denial of XPV's qualified application.

56.     To begin with, Seward said that XPV's application was "deemed Substantially Complete on November 10, 2009."  In fact, XPV's application had been deemed substantially complete on December 31, 2008.

57.     Seward said that the "proposed technology appeared…to be at a development stage and not yet ready for commercialization" and that the "assumption that the vehicle concept would be ready for production in three years" was a "significant weakness" due to the "high level of risk associated with the design."  In fact, XPV's SUV technology had been in use commercially by the U.S. Department of Defense, NASA and the automobile industry; the politically-connected companies that were awarded ATVM Loan Program funds were no further ahead in production than XPV; and elements of XPV's "high risk design" were already in use by Toyota and Nissan in the retail consumer market worldwide.

58.     Seward said "the proposed project's impact on fuel economy…was determined to be weak."  In fact, non-gasoline powered automobiles were uniformly acknowledged by DOE and other industry experts as the most significant source of fuel economy improvement.  Moreover, XPV's SUV promised better fuel economy than any of the ATVM Loan Program "winners" (Tesla, Nissan, Ford or Fisker) proposed or actually offer to this day.

59.     Seward said "A review of the advanced fuels in your project and the feasibility of that energy source…was questionable."  In fact, the fuels, products and subparts of the

"questionable" energy source are readily available to consumers at REI Sporting Goods, Amazon.com and Safeway supermarkets, among other places.

60.     Seward said "A review of the calculations and assumptions supporting your claims for reductions in petroleum use were deemed to be unrealistic."  In fact, XPV's calculations and assumptions were confirmed by institutional research and white papers from respected government and university agencies.

61.     Seward said that XPV's project "may be commercializable in the future, but is far too early in the development process to qualify" for ATVM Loan Program funds.  In fact, XPV was at least as far along in the "development process" as Tesla and Fisker, the politically-connected companies funded by Defendants.

62.     Seward's letter was the first time any of these issues had been raised by Defendants with XPV, notwithstanding ten months of "review" including multiple meetings, phone calls and emails.

63.     In fact, not only had Defendants never before raised these "issues" with XPV, it had affirmatively declined, over a period of months, to seriously consult with XPV's engineers and denied XPV the "interactive" review that they had promised to give in April 2009, and that they had in fact given to the politically-connected ATVM Loan Program winners Tesla and Fisker.

64.     Critically, Defendants did *not* say in Seward's October 21, 2009, letter or anywhere else that XPV had offered inadequate security for the loan; that XPV was a repayment risk; that XPV had failed to demonstrate that there was a "reasonable prospect of repayment" of the proposed loan; that XPV had failed to demonstrate it was capable of building, distributing or

selling the proposed SUV; or that XPV had failed to demonstrate "financial viability without the loan" as required by law.

65.     To this day, neither Foster nor Chu nor Seward nor anyone else at DOE has ever provided XPV with DOE's "merit review" evaluation records and criteria.

66.     At all times relevant, XPV qualified for the requested ATVM Loan Program funds pursuant to 10 C.F.R. Part 611.  DOE has repeatedly refused Freedom of Information Act requests aimed at securing disclosure of these records and criteria.

67.     At all times relevant, XPV had numerous and viable offers from and business opportunities with potential investors, manufacturing partners, distributors and customers. However, Defendants' wrongdoing, including their purposeful delay and baseless denial of XPV's ATVM Loan Program application, denied XPV the benefit of these business opportunities.

<u>Limnia's ATVM Application</u>

68.     On or about February 1, 2009, Limnia applied for $15 million in ATVM Loan Program funds to produce a "best of breed and state of the art" advanced technology vehicle energy storage system using Limnia's patented technology.  Sandia was designated as a key subcontractor in this effort.

69.     On April 10, 2009, Seward denied Limnia's application on the grounds that the components "do not appear to be designed for installation in an advanced technology vehicle…" *See* <u>Exhibit 6</u>.  However, these grounds were false and a mere pretext to preserve ATVM Loan Program funds for government-favored companies and/or to protect those companies from competition.

70.     On April 11, 2009, Limnia requested reconsideration, reminding Seward that the relevant patents provided stated that the components in question were meant for use in advanced technology vehicles; that Sandia's vehicle technologies group was the prime subcontractor for the project; and that DOE had funded the technology's development specifically for such use. *See* Exhibit 7.

71.     On May 13, 2009, Seward again denied Limnia's application because the technology was "not installed in the advanced technology vehicle."  This time, though, he asked for more information.  *See* Exhibit 8.

72.     On June 3, 2009, Limnia responded with the requested information.  It again requested reconsideration, pointing out that the components in question "*must* be installed prior to use in an advanced technology vehicle and are, accordingly, designed for such installation and therefore [are]…'qualifying components.'"  *See* Exhibit 9.

73.     Defendants never responded to this letter.

74.     At all times relevant, Limnia qualified for the requested ATVM Loan Program funds pursuant to 10 C.F.R. Part 611.


Limnia's LGP Application

75.     At all times relevant, DOE recognized that the LGP application fees and process were unduly onerous and burdensome.

76.     On or about February 1, 2009, Limnia participated in a conference call with John Podesta, Chu, and Interior Secretary Kenneth Salazar, during which Chu said he felt the LGP fee and process were unduly onerous and burdensome.  Chu further promised to waive the application fee.

77.     Relying on this promise, Limnia filed a LGP application on or about February 10, 2009, with a cover letter stating that it was Limnia's understanding Defendants had waived the application fee.

78.     Limnia heard nothing from DOE until February 26, 2009, the application deadline.  On that day, DOE's Myrtle Gross called and said that the initial application fee of $18,000 had to be paid by midnight for Limnia's LGP application to be considered.  This was Limnia's first and only notice that Defendants had reneged on their promise to waive the LGP application fee.

79.     Limnia had the funds to make payment but could not complete the transaction by the midnight deadline.  Therefore, it considered the matter as closed.

80.     On February 27, 2009, Daniel Tobin, DOE's Loan Programs Office Senior Investment Officer, called and said that there were "a few days of flexibility" to send in the application fee and promised to provide wire instructions.  Tobin also promised to "pre-review" the application and to call back with feedback for Limnia's investors.

81.     Over the next six weeks, Limnia sent Defendants emails and letters, and made phone calls, seeking what Tobin had promised.  However, Limnia never heard back from Tobin or anyone else at DOE.  Instead, on April 9, 2009, Limnia received an email from Tobin dismissing it from the LGP without recourse.  *See* Exhibit 10.

82.     Limnia requested reconsideration, which Defendants denied.

Defendants' Cronyism And Program Abuses

83.     Because DOE's "merit review" criteria and process were so opaque, the taxpayer-funded ATVM Loan Program and LGP became cash cows for government cronies.

84.     Politics and political pressure infected these programs, shaping, in whole or in part, the judgment of the agency's ultimate decision makers, including Defendants Chu and Seward, their staffs, advisors and consultants.

85.     In February 2011, GAO issued an investigative report on DOE's ATVM Loan Program.  *See* Exhibit 11 "Advanced Technology Vehicle Loan Program Implementation Is Under Way, but Enhanced Technical Oversight and Performance Measures Are Needed," GAO-11-145 (Feb. 28, 2011).

86.     GAO found that DOE had made billions in loans without engaging "engineering expertise needed for technical oversight."  As a result, GAO said "DOE cannot be adequately assured that the projects will be delivered as agreed."

87.     Furthermore, GAO found that "DOE has not developed sufficient performance measures that would enable it to fully assess the extent to which it has achieved its…program goals" contrary to sound administrative agency practices.

88.     Defendants' irrational failure to employ appropriate engineering expertise for application reviews, and their arbitrary and capricious refusal to use objective performance measures facilitated the politicization of DOE's loan programs.

89.     In truth, Defendants used the ATVM Loan Program as nothing more than a veil to steer hundreds of millions of taxpayer dollars to government cronies, including Tesla and Fisker.

90.     For example, Tesla's loan of $465 million, announced on June 24, 2009, was obtained in whole or material part through the efforts and influence of political patrons.

91.     These patrons included Steven Westly, who was a major campaign contributions "bundler" for the White House.  Westly's fundraising bought him special White House access and an appointment on a key DOE advisory board.  Upon information and belief, Westly sat on

Tesla's board from March 2007 to December 2009, during the time when DOE gave Tesla $465 million taxpayer dollars.

92.     These patrons also included DOE's Steven Spinner, an accomplished campaign contribution "bundler" whose fundraising had bought him a primary role in DOE's Loan Program Office.  Upon information and belief, Spinner, too, was at all times relevant a Tesla investor and advisor.

93.     Tesla's patrons' contributions, and the political access secured thereby, were material factors in Defendants' favorable treatment of and preferences for Tesla during the ATVM Loan Program application process and in Defendants' decision to lend Tesla nearly half a billion taxpayer dollars at highly favorable below-market rates and terms.

94.     Predictably, Tesla's business results have not justified Defendants' special favors.

95.     For example, Tesla, using taxpayer money to build a luxury vehicle aimed at rich actors, media personalities and businessmen, has repeatedly missed production targets, burned through cash and required DOE to repeatedly renegotiate loan terms to survive.

96.     On November 12, 2012, Tesla notified the Securities and Exchange Commission that:

> On January 20, 2010, we entered into a loan facility with the Federal Financing Bank (FFB), and the Department of Energy (DOE), pursuant to the Advanced Technology Vehicles Manufacturing (ATVM) Incentive Program. This loan facility was amended in June 2011 to expand our cash investment options, in February 2012 to modify the timing of certain future financial covenants and funding of the debt service reserve account, and in June 2012 to allow us to effect certain initiatives in our business plan. We entered into another amendment with the DOE in September 2012 to remove our obligation to comply with the current ratio financial covenant as of September 30, 2012 and amend the timing of pre-funding the principal payment due in June 2013.  Under the DOE Loan Facility, the FFB has made available to us two multi-draw term loan facilities in an aggregate principal amount of up to $465.0 million. Up to an aggregate principal amount of $101.2 million had been made available under the first term loan facility to finance up to 80% of the costs eligible for funding for the powertrain

engineering and the build out of a facility to design and manufacture lithium-ion battery packs, electric motors and electric components (the Powertrain Facility). Up to an aggregate principal amount of $363.9 million has been made available under the second term loan facility to finance up to 80% of the costs eligible for funding for the development of, and to build out the manufacturing facility for, our Model S sedan (the Model S Facility). Under the DOE Loan Facility, we are responsible for the remaining 20% of the costs eligible for funding under the ATVM Program for the projects as well as any cost overruns for each project. As of August 31, 2012, we have fully drawn down the aforementioned facilities.

97.    In other words, Tesla has spent all of the taxpayer funds it was given but needs new ATVM loan repayment terms because it cannot keep its original commitments.

98.    In 2008, Tesla promised to construct a factory in 2009 and then begin mass production of the vehicle known as the "Model S."  On November 7, 2012, it reported delivering a total of 256 such vehicles.  Between 2008 and 2012, Tesla sold fewer than 2,500 of its "Roadster" models worldwide.  Now it promises "mass production" of the "Model S" will begin in 2013.

99.    Fisker's ATVM Loan Program application for $528.7 million, announced on September 22, 2009 (approximately a month after Defendants had rejected XPV's qualified ATVM Loan Program application), also was obtained in whole or in material part through the efforts and influence of political patrons on Defendants Chu and Seward.

100.    Fisker's patrons were John Doerr and the investment firm of Kleiner, Perkins, Caufield & Byers ("KPCB").  At all times relevant, Doerr was a KPCB partner along with former Vice President Al Gore, among others, and KPCB was a Fisker investor.  Doerr and his partners donated millions to the 2008 Obama campaign and related Democrat political causes, buying preferential government treatment for their business interests.  Among other things, Doerr's political contributions earned him high-level White House access and a seat on the President's Council on Jobs and Competitiveness.

101.    Contributions by Fisker's patrons, and the political influence secured thereby, were material factors in Defendants' favorable treatment of and preferences for Fisker during the ATVM Loan Program application process and in Defendants' decision to lend Fisker over half a billion taxpayer dollars at highly favorable below-market rates and terms.

102.    Predictably, Fisker's performance has not justified Defendants' favors.

103.    For example, DOE gave Fisker approximately $169.3 million for "engineering integration" of a high-cost electric luxury car in Finland, and approximately $359 million for manufacturing a low-cost plug-in hybrid sedan in the U.S. known as "Project Kx."  *See* Exhibit 12 "Conditional Commitment Letter by and between United States Department of Energy and Fisker Automotive, Inc. – Execution Copy (Sept. 18, 2009)."

104.    Defendants committed approximately $359 million to Project Kx without seeing a prototype or properly verifying Fisker's engineering, sales and supply chain claims. Nevertheless, DOE asserted in a White House Press release that Fisker's loan would "create or save about 5,000 jobs" just for domestic parts suppliers" and parroted Fisker's claim that "up to 75,000–100,000 [Project Kx] vehicles will roll off assembly lines in the U.S. every year beginning in late 2012."

105.    Fisker did not make Kx prototype available to the public or begin Kx production in 2010.

106.    Fisker did not make a Kx prototype available to the public or begin Kx production in 2011, although it promised "mass production" would begin by the end of 2012.

107.    On or about February 7, 2012, after Fisker had spent over $170 million taxpayer funds, DOE froze its credit facility due to many missed deadlines.  In June 2012, Fisker made the

Kx prototype available to the public.  The "low cost" sedan funded by Defendants in 2009 turned

out to be a $55,000 luxury car called the "Atlantic."

108.     Defendants had said that 75,000–100,000 Fisker Kx cars would be rolling off

domestic assembly lines by the end of 2012.  On October 18, 2012, Fisker reported that mass

production of the "Atlantic," which still has yet to begin, was delayed until 2014 or 2015.

109.     Since 2008, Fisker has sold approximately 1,500 vehicles world-wide.  Upon

information and belief, the $170 million of taxpayer money spent by Fisker to date has "saved or

created" one hundred or fewer jobs.

110.     In March 2012, and in response to complaints by Limnia and others, GAO

reported on DOE's LGP performance.  *See* Exhibit 13 "DOE Loan Guarantees: Further Actions

Are Needed to Improve Tracking and Review of Applications," GAO-12-157 (March 2012).

111.     GAO found that DOE treated LGP applicants inconsistently, favoring some and

disadvantaging others; lacked systematic mechanisms for LGP applicants to administratively

appeal adverse decisions; often ignored its own underwriting standards and skipped review steps;

and re-reviewed rejected applications on an ad hoc basis.  It also found that DOE's practice of

"[o]mitting or poorly documenting reviews reduces LGP's assurance that it has treated applicants

fairly and equitably."

112.     In October 2012, emails released by Congress confirmed politics had

impermissibly infected DOE's loan programs and were shaping the Defendants' judgment with

respect to funding determinations.  *See, e.g.* Exhibit 14 (Email from Jonathan Silver, former

Executive Director, DOE Loan Programs Office, to James C. McCrea, DOE LPO credit advisor,

dated June 25, 2010, stating "WH wants to move Abound [project] forward.  Policy will have to

wait…"); Exhibit 15 (Email from James C. McCrea to B. Oakley, dated September 9, 2010,

stating "Pressure is on real heavy…due to interest from VP"); Exhibit 16 (Email from Monique

Fridell to Kimberly Heimert, et. al., dated May 25, 2010, stating "DOE has made a political

commitment to get Unistar through the approval process by 6/15"); Exhibit 17 (Email from

James C. McCrea to Monique Fridell, et. al., dated June 1, 2010, stating "Secretary [of

Energy]…is adamant that this transaction is going to OMB by the end of the day Fri if not

sooner.  Not a way to do things but a direct order.").

113. Thus, Defendants bent the rules for political favorites such as Sen. Harry Reid and

Rep. Steny Hoyer, and government cronies received special personal access to high-ranking

DOE loan program officials.  *See, e.g.* Exhibit 18 (Email from James C. McCrea to "barbiar",

dated December 5, 2009, stating "[Harry] Reid may be desperate.  WH may want to help.  Short

term considerations may be more important than long term considerations and what's a billion

anyhow?"); Exhibit 19 (Email from James C. McCrea to Julie Stewart, dated May 25, 2010,

stating "7th Floor has decided mid June CRB…there has been a commitment from S1 [Secretary

Chu] to Steny Hoyer on this.  Nothing like over committing and under delivering"); Exhibit 20

(Email from Brightsource Chairman John Woolard, an LGP applicant, to Jonathan Silver, DOE

Loan Office Director, dated November 10, 2010, stating "Thanks for offering to meet at your

house tomorrow morning." Silver replied "Came [sic] anytime.  Guest bedroom is ready.")

### Defendants' Abuse of XPV and Limnia

114. Defendants did not review XPV's and Limnia's ATVM Loan Program

applications in good faith and in accordance with DOE's regulations, policies and promises.

115. Instead, Chu and Seward stonewalled XPV and Limnia to benefit Tesla, Fisker

and others favored because of their political contributions and connections.  This damaged XPV

and Limnia severely.

116. To begin with, when Defendants "fixed" the ATVM Loan Program and LGP to benefit government cronies, they knowingly and intentionally rendered XPV's and Limnia's ATVM Loan Program and LGP applications futile. Through their multiple written and verbal representations, and the written and verbal representations of their subordinates, all of whom had actual and apparent authority to bind the agency, Defendants intentionally induced XPV, Limnia and others similarly situated to spend hundreds of thousands of dollars and invest thousands of hours of engineering and professional time on a meaningless snipe hunt.

117. Defendants' ATVM Loan Program abuses, including delaying term sheets and wrongly denying loans among other things, hamstrung XPV's and Limnia's ability to raise private capital, to begin production and to sell advanced technology vehicles to customers that were ready, willing, able and eager to buy XPV's SUV.

118. Defendants Chu and Seward skewed, manipulated and fixed DOE's ATVM Loan Program review to protect and advance the business and political interests of government cronies at XPV's and Limnia's expense. For example:

    a. Defendants made ATVM loans only to companies with political clout, contributions and influence-peddling patrons.

    b. Defendants discriminated among applicants based on political contributions and connections.

    c. Defendants: (1) changed the ATVM Loan Program funds distribution date and the "first in, first out" review process to benefit Tesla, Fisker and other politically-connected companies; (2) arranged for Tesla, Fisker and others in the favored class to have their applications reviewed first; (3) arranged for Tesla, Fisker and others in the favored class to receive special favors from DOE officials and

unique DOE staff assistance; and (4) arranged for Tesla, Fisker and others in the favored class to be walked through the "review" process, approved and then given money.  However, XPV, Limnia and other similarly situated companies that lacked political connections and political patrons were denied these things. Instead, they were limited to pre-textual diligence and application reviews.  For example, XPV spoke with Carol Battershel, who claimed to be the due diligence technical lead on XPV's ATVM Loan Program application.  XPV offered complete access to company engineers and management to assist the review process. Battershel declined, saying that she had gotten everything she needed "off [XPV's] website."

d.  Defendants ignored standard commercial lending procedures and DOE's own rules, guidance and policies—including the use of competent engineers to carry out technical review and the consistent application of the same funding criteria to each application--whenever necessary to benefit government cronies.

e.  Defendants made final ATVM Loan Program and LGP review and funding decisions without material regard for DOE's published criteria and regulations. For example, in or about October 2009, XPV and Limnia were told by a DOE contractor that Seward had been angered by XPV's and Limnia's public complaints about DOE's loan program administration and that Seward told his staff in late 2008 that it would be "a cold day in hell before I let them [XPV and Limnia] get any money."

f.  Notwithstanding billions in lending authority; a Presidential directive to put "one million electric cars on the road"; and multiple qualified applicants (including

24

XPV and Limnia), Defendants have not made even one ATVM loan since September 2009.  Their refusal to give effect to Congressional and Presidential directives by making ATVM loans to *all* qualified applicants, up to the limit of their lending authority, is the result of a political decision to protect government favorites such as Fisker and Tesla from competition and not because of merit or other legitimate factors.

g.  Upon information and belief and at all times relevant, Defendants "carved out" funds from DOE's authorized lending authority and "held" them for government cronies who made political contributions and/or hired political fixers to obtain "top-tier status" and "special relationships."

h.  Defendants repeatedly renegotiated the Tesla and Fisker loans contrary to sound commercial lending practices to avoid political embarrassment and to protect those companies' political patrons.

i.  Defendants denied XPV's and Limnia's ATVM Loan Program applications on baseless pretexts.  These included false XPV application "defects" and the assertion that an energy storage component developed by Limnia with DOE and patented for use in an advanced technology vehicle was, in fact, not an advanced technology vehicle component for ATVM Loan Program purposes.

j.  Defendants promised to waive the LGP application fee for Limnia.  Hours before the payment deadline, they reneged.  The next day, DOE contacted Limnia promising to accept late payment.  Again, Defendants reneged.

k.  Defendants hid the "merit review" data, criteria, reviewer identities, reviewer work histories, and other information from XPV, Limnia, all other ATVM Loan

Program applicants and the public.  This information, if disclosed, would have allowed XPV, Limnia and others similarly situated to evaluate the efficacy and fairness of that review.  Instead, Defendants have wrongly refused to make this information available.

l.   Defendants willfully, intentionally and substantially overestimated government crony company production capabilities and sales performance to justify ATVM Loan Program funding.  For example, DOE promised that Fisker alone would have "75,000–100,000" ATVM Loan Program-funded cars rolling off of U.S. assembly lines.  Paradoxically, Defendants denied XPV's Loan Program application because XPV allegedly would not produce "enough" vehicles, yet in 2012, the politically-connected companies that Defendants funded have, combined, sold fewer than 25,000 advanced technology vehicles nationwide.

m.   Defendants ignored their obligations under the Information Quality Act, 44 U.S.C. § 3516 note, and its applicable guidelines, with respect to their review and analysis of the financial and statistical information submitted by the government-favored companies that were given ATVM Loan Program funds, and with respect to the information disseminated by DOE in support thereof.

119.   As a direct consequence of Defendants' wrongdoing, broken promises and political cronyism, XPV and Limnia were improperly denied ATVM Loan Program and LGP funds; deprived of an equal opportunity to have their applications judged fairly, on a level playing field and in accordance with law; wrongly refused funds that they were entitled to receive under applicable DOE criteria, including 10 C.F.R. Part 610; and prevented from

creating good American jobs through the production, marketing and sale of advanced technology vehicles and systems developed in conjunction with DOE's own scientists.

## Claims for Relief

### *First Claim for Relief: Due Process Violations by Chu and Seward.*

120.　　XPV and Limnia repeat paragraphs 1-119.

121.　　At all times relevant, XPV and Limnia each had a procedural Fifth Amendment due process right to have their ATVM Loan Program applications considered fairly and equally on their merits, without regard for political contributions, political influence or the competitive interests of government crony companies such as Tesla and Fisker.

122.　　At all times relevant, XPV and Limnia satisfied all of Defendants' ATVM Loan Program published eligibility criteria, including 10 C.F.R. Part 611.

123.　　XPV was officially deemed a "qualified applicant" by DOE pursuant to 10 C.F.R. Part 611.

124.　　Limnia, too, was a "qualified applicant" under 10 C.F.R. Part 611.

125.　　At all times relevant, Defendants had the legal authority to lend the ATVM Loan Program funds XPV and Limnia had applied and qualified for, each in response to the Defendants' invitation and solicitation.

126.　　Therefore, XPV and Limnia each had a substantive Fifth Amendment due process right and a constitutionally-protected property interest in those funds.

127.　　However, in abuse of their authority and contrary to law, Chu and Seward conspired and agreed to violate XPV's and Limnia's constitutional rights by skewing, manipulating and fixing the ATVM Loan Program to steer funds to and protect government cronies.

128.    Improperly elevating political contributions and influence as factors in the funding DOE loans, Chu and Seward deprived XPV and Limnia of their right to a fair and level review of their applications and denied them access to the government loan funds they were entitled to receive as qualified ATVM Loan Program applicants.

129.    Chu and Seward did not have either the legal authority or the bureaucratic discretion to do these things.

130.    In or about February 2011, GAO published serious programmatic criticisms of Defendants' ATVM Loan Program administration.

131.    XPV and Limnia became aware of GAO's criticisms shortly after they were published.

132.    However, it was not until September 29, 2011, with the publication of credible, sourced media stories tying ATVM Loan Program funding decisions to political campaign "bundlers" including Westly, Spinner and Doerr, that XPV and Limnia discovered that political influence and campaign contributions had impermissibly infected Chu's and Seward's decision making and that these considerations had likely caused Defendants to deny XPV's and Limnia's ATVM Loan Program applications to protect the government's political cronies.  *See, e.g.,* Exhibit 21 Mosk and Greene, "Obama Fundraisers Tied to Green Firms That Got Federal Cash," ABC News (Sept. 19, 2011).

133.    Chu's and Seward's due process violations, jointly and severally, have damaged XPV and Limnia in excess of $225 million.

***Second Claim for Relief: Administrative Procedure Act (XPV ATVM Loan).***

134.    XPV repeats paragraphs 1-133.

135.     XPV was a "qualified applicant" for ATVM Loan Program funds pursuant to 10 C.F.R. Part 611.

136.     DOE's final agency action denying XPV's ATVM Loan Program application was contrary to law, arbitrary and capricious, and in excess of its statutory authority.

137.     Furthermore, the agency's action in this case was impermissibly infected with political pressure, which shaped, in whole or in part, the judgment of the ultimate agency decision makers with respect to that application.

138.     As a result, XPV has been directly harmed and aggrieved.

139.     XPV has exhausted all administrative remedies.

140.     Alternatively, such exhaustion would be futile as DOE has fixed the ATVM Loan Program to benefit government cronies and there are no circumstances under which XPV's ATVM Loan Program application would ever be approved by the agency.

***Third Claim for Relief: Administrative Procedure Act (Limnia ATVM Loan).***

141.     Limnia repeats paragraphs 1-140.

142.     Limnia was a "qualified applicant" for ATVM Loan Program funds pursuant to 10 C.F.R. Part 611.

143.     DOE's final agency action denying Limnia's ATVM Loan Program application was contrary to law, arbitrary and capricious, and in excess of its statutory authority.

144.     Furthermore, the agency's action in this case was impermissibly infected with political pressure, which shaped, in whole or in part, the judgment of the ultimate agency decision makers with respect to that application.

145.     As a result, Limnia has been directly harmed and aggrieved.

146.     Limnia has exhausted all administrative remedies.

147.    Alternatively, such exhaustion would be futile as DOE has fixed the ATVM Loan Program to benefit government cronies and there are no circumstances under which Limnia's ATVM Loan Program application would ever be approved by the agency.

***Fourth Claim for Relief:  Administrative Procedure Act (Limnia LGP Application).***

148.    Limnia repeats and incorporates by reference paragraphs 1-147.

149.    DOE's final agency action denying Limnia's LGP application was contrary to law, arbitrary and capricious, and in excess of its statutory authority.

150.    Furthermore, the agency's action in this case was impermissibly infected with political pressure, which shaped, in whole or in part, the judgment of the ultimate agency decision makers with respect to that application.

151.    As a result, Limnia has been directly harmed and aggrieved.

152.    Limnia has exhausted all administrative remedies.  Alternatively, such exhaustion would be futile.

### Relief Requested

WHEREFORE XP requests the following relief:

A.    Damages in excess of $225 million against Chu and Seward, jointly and severally, for their violations of XPV's and Limnia's civil rights.

B.    A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) that XPV's ATVM Loan Program application was wrongfully denied and injunctive relief directing Defendants to reconsider and/or approve same.

C.    A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B) Limnia's ATVM Loan Program application was wrongfully denied and injunctive relief

directing Defendants to reconsider and/or approve same without respect for political

considerations.

D.      A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706(2)(B)

that the rejection of Limnia's LGP application without recourse was unlawful, and injunctive

relief directing Defendants to accept and consider same without respect for political

considerations.

D.      Such costs and attorney fees as XP may be entitled to under law.

E.      Such other relief as this Court deems just.

Respectfully submitted,


/s/ Daniel Z. Epstein
Daniel Z. Epstein
D.C. Bar No. 1009132
Cause of Action, Inc.
1919 Pennsylvania Ave, N.W., Suite 650
Washington, D.C. 20006
Telephone: (202) 499-4232
daniel.epstein@causeofaction.org



/s/ Reed D. Rubinstein
Reed D. Rubinstein, Partner
D.C. Bar No. 440153
Dinsmore & Shohl, L.L.P.
801 Pennsylvania Ave., NW, Suite 610
Washington, D.C. 20006
Telephone: (202) 372-9120
Fax:  (202) 372-9141
reed.rubinstein@dinsmore.com


Signed:  January 10, 2013

### XPV Verification

I am Scott Redmond, an officer, director and shareholder of XP Vehicles, Inc., a plaintiff in this action.

I have read the forgoing complaint, and verify and declare on XP Vehicles, Inc. behalf that its factual allegations are true, except to those matters stated on information and belief and as to those matters I believe them to be true to the best of my knowledge.

XP VEHICLES, INC.

Date: 1/8/13

By: Scott Redmond
Its: president + CEO

### Limnia Verification

I am Scott Redmond, an officer, director and shareholder of Limnia, Inc., a plaintiff in this action.

I have read the forgoing complaint, and verify and declare on Limnia's behalf that its factual allegations are true, except to those matters stated on information and belief and as to those matters I believe them to be true to the best of my knowledge.

LIMNIA, INC.

Date: 1/8/13

By: Scott Redmond
Its: president + CHAIRMAN

32