**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| XP VEHICLES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-0037 (KBJ) |
| | ) | |
| DEPARTMENT OF ENERGY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Congress has authorized the Department of Energy ("the DOE") to offer direct

financial support to the manufacturers of clean energy vehicles and related components.

*See* 42 U.S.C. § 17013 (2012).  In accordance with this statutory mandate, the DOE

administers various loan programs, including the Advanced Technology Vehicle

Manufacturing ("ATVM") Loan Program, which is designed to provide direct loans to

manufacturers of energy-efficient vehicles.  The DOE also administers the Section 1703

Loan Guarantee Program ("LG Program"), pursuant to which the agency guarantees

loans for advanced technology projects that result in the avoidance or reduction of air

pollutants.  Plaintiff XP Vehicles, Inc. ("XPV") is a now-dissolved California-based

corporation that applied to the DOE in November of 2008 for an ATVM loan for the

manufacture of a light-weight, energy-efficient sport utility vehicle.  XPV partnered

with Plaintiff Limnia, Inc. ("Limnia"), a Delaware-based corporation that developed an

energy storage system to power XPV's proposed vehicle.  Limnia, too, applied to the

DOE for loan assistance, seeking both an ATVM loan and an LG Program loan

guarantee in February of 2009.  The DOE denied both Plaintiffs' loan requests, and

XPV and Limnia have now filed a seven-count complaint against the DOE, its Secretary

Ernest Moniz in his official capacity, former Secretary of Energy Steven Chu in his

individual capacity, and former Director of the ATVM Loan Program Lachlan Seward

in his individual capacity (collectively, "Defendants"), alleging that the DOE's

decisionmaking process with respect to these loan programs was infused with cronyism

and political favoritism and that their applications were denied unfairly and arbitrarily.[1]

In essence, Plaintiffs maintain that, instead of reviewing applications impartially and on

the merits, Defendants used the ATVM Loan Program and LG Program to reward

political patrons, in violation of the Constitution's due process and equal protection

guarantees and in contravention of the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701–706 (2012).

Before this Court at present are two motions to dismiss Plaintiffs' complaint: one

from the DOE and Moniz ("the Official Capacity Defendants"), and one from Chu and

Seward (the "Individual Capacity Defendants").  The Official Capacity Defendants

make various threshold jurisdictional arguments, including sovereign immunity, lack of

standing, and ripeness; on the merits, they argue both that XPV lacks the capacity to

sue because it is a dissolved corporation and that Plaintiffs have failed to state a claim

upon which relief can be granted.  The Individual Capacity Defendants adopt the

Official Capacity Defendants' dismissal arguments, and further argue that XPV's claims

---

[1] Plaintiffs' complaint not only names Seward in his individual capacity, it also names him in his official capacity as "Director of the ATVM Loan Program."  However, Seward has stepped down from this position since the complaint in this matter was filed, and it appears that the title of Director of the ATVM Loan Program no longer exists.  Accordingly, this Court has dismissed Plaintiffs' claims brought against Seward in his official capacity.  Thus, Seward is characterized throughout this Memorandum opinion solely as an "Individual Capacity Defendant."

are barred by the statute of limitations; that no *Bivens* action exists for the alleged constitutional violations; and that, even if a remedy did exist, Chu and Seward are protected by qualified immunity.

As explained further below, this Court concludes that, although it does have jurisdiction over the claims Plaintiffs make in their complaint, all of XPV's claims and most of Limnia's claims must be dismissed in their entirety.  XPV's claims against the Official Capacity Defendants must be dismissed because, as a dissolved corporation, XPV does not have the capacity to sue for injunctive relief, and XPV's claims against the Individual Capacity Defendants must be dismissed because no *Bivens* action exists that will permit XPV to recover monetary damages from those defendants.  Limnia's constitutional claims fail in a similar fashion, both because there is no *Bivens* action and also because Limnia has not alleged facts that are sufficient to state a constitutional claim.  But Limnia's two APA claims—which arise out of the denial of its ATVM loan application, on the one hand, and the processing of its LG Program application, on the other—survive the pending motions to dismiss because Limnia has adequately alleged that the DOE's denials of Limnia's ATVM Loan Program and LG Program applications were the result of arbitrary and capricious agency action in violation of the APA. Consequently, the Official Capacity Defendants' motion to dismiss will be **GRANTED IN PART** and **DENIED IN PART**, and the Individual Capacity Defendants' motion to dismiss will be **GRANTED** in full.  A separate order consistent with this opinion will follow.

I.    **BACKGROUND**

   A.    **The DOE's Implementation Of The ATVM Loan Program And The LG Program**

      1.    <u>The ATVM Loan Program</u>

In 2007, Congress enacted the Energy Independence and Security Act ("EISA"),

Pub. L. 110-140, § 136, 121 Stat. 1492, 1514–16, with the express purpose of

"mov[ing] the United States toward greater energy independence and security" and

"increas[ing] the efficiency of products, buildings, and vehicles[.]" *Id.* at 1492.  To this

end, the EISA imposed heightened fuel economy standards, *see id.* § 102, and it also

introduced several new financial assistance programs designed to further the objective

of promoting the efficient use of energy resources, *see, e.g.*, *id.* § 131 (providing grants

to encourage the use of electric vehicles); *id.* § 135 (providing loan guarantees for the

domestic manufacture of vehicle batteries).  The Advanced Technology Vehicle

Manufacturing Loan Program—referred to throughout this opinion as "the ATVM Loan

Program"—was one of these initiatives.  *See id.* § 136.

Under the ATVM Loan Program, the DOE provides a total of $25 billion in

direct loans to the manufacturers of "advanced technology vehicles" and the "qualifying

components" of such vehicles, so long as these manufacturers are engaged in certain

eligible activities.  42 U.S.C. § 17013(d)(1).[2]  The EISA specifies that ATVM loan

applicants must submit applications to the Secretary of the DOE, and that upon

---

[2] The statute defines an "advanced technology vehicle" as "an ultra efficient vehicle or a light duty vehicle that meets" certain fuel economy and emission standards.  *Id.* § 17013(a)(1).  "Qualifying components" are those that "the Secretary [of Energy] determines to be . . . designed for advanced technology vehicles" and "installed for the purpose of meeting the performance requirements" of such vehicles—*i.e.*, products designed to meet the EISA's fuel economy and emission standards.  *Id.* § 17013(a)(4).  The eligible activities include "requipping, expanding, or establishing a manufacturing facility in the United States" or "engineering integration" of the manufactured product.  *Id.* § 17013(b).

receiving such loan applications, "[t]he Secretary shall select eligible projects" using criteria listed in the statute. *Id.* § 17013(d)(2)–(3).  Specifically, by statute, a successful "award recipient"—

> (A) is financially viable without the receipt of additional Federal funding associated with the proposed project;
>
> (B) will provide sufficient information to the Secretary for the Secretary to ensure that the qualified investment is expended efficiently and effectively; and
>
> (C) has met such other criteria as may be established and published by the Secretary.

42 U.S.C. § 17013(d)(3).  Furthermore, under the DOE's implementing regulations,  an ATVM loan applicant must be "[a]n automobile manufacturer that can demonstrate an improved fuel economy" or "[a] manufacturer of a qualifying component[,]" 10 C.F.R. § 611.100(a) (2015), and the regulations also require such applicants to provide, *inter alia*, a description of "the nature and scope of the proposed project[,]" which must include "key milestones and [the] location of the project" and a "detailed explanation of how the proposed project qualifies" for loan assistance, *id.* § 611.101.

The DOE has adopted a two-step procedure for evaluating ATVM loan applications.  First, the agency engages in "eligibility screening"—*i.e.*, it determines whether the application contains the required information; whether the applicant satisfies the eligibility criteria; and whether the terms of the requested loan comport with the applicable statutory requirements.  *Id.* § 611.103(a).  The regulations state in no uncertain terms that the DOE "can at any time reject an application, in whole or in part, that does not meet these [eligibility] requirements."  *Id.*  If the application survives eligibility screening, the DOE will then move on to the second stage of the application process, which consists of a substantive merits review of the application.

*Id.* § 611.103(b).  The regulations establish that this review will be based on factors such as the project's "technical merit" and whether the proposed loan conditions adequately protect the government investment by providing sufficient security, priority of lien position, and percentage of the project to be financed with the loan.  *Id.*

Significantly, the regulations that govern the ATVM Loan Program also state that "[o]nly an Agreement executed by a duly authorized DOE Contracting Officer can contractually obligate the government to make a loan" under the program.  *Id.* § 611.105(a).  And the regulations make clear that the "DOE is not bound by oral representations made during the Application stage, or during any negotiation process." *Id.* § 611.105(b).

2.  <u>The LG Program</u>

The Section 1703 Loan Guarantee Program was established as part of the Energy Policy Act of 2005.  *See* Pub. L. No. 109-58, § 1701–04, 119 Stat. 594, 1117–22 (codified at 42 U.S.C. §§ 16511–14).  The statute is aimed at promoting new and improved technologies that "avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gases[,]" 42 U.S.C. § 16513(a), and it authorizes the DOE to guarantee loans for certain environmentally-friendly, energy-efficient projects, *id.* Among the categories of projects that are specified as qualifying for this loan program are "[h]ydrogen fuel cell technology" and "production facilities for the manufacture of fuel efficient vehicles or parts of those vehicles, including electric drive vehicles[.]" *Id.* § 16513(b).

Like the regulations that govern the ATVM Loan Program, the LG Program regulations set out a comprehensive but non-exhaustive list of "information and materials" that must be submitted as part of an application, including "[a] description of

6

how and to what measurable extent the project avoids, reduces, or sequesters air pollutants and/or anthropogenic emissions of greenhouse gases, . . . [a] description of the nature and scope of the proposed project, . . . [and a] detailed description of the overall financial plan for the proposed project[.]"  10 C.F.R. § 609.6(b).  Moreover, similar to the ATVM Loan Program, the regulations specify that "[o]nly a Loan Guarantee Agreement executed by a duly authorized DOE Contracting Officer can contractually obligate DOE to guarantee loans or other debt obligations[,]" *id.* § 609.10(a), and that the "DOE is not bound by oral representations made" at any stage in the application process, *id.* § 609.10(b).

However, unlike the ATVM Loan Program application process, the LG Program regulations require "[p]ayment of [an] Application filing fee" as part of an LG Program application,  and the regulations specifically state that the "DOE will not consider any Application complete" until the application fee is paid.  *Id.* § 609.6(b)(2), (c). Moreover, LG Program applications that satisfy all of the applicable requirements are ultimately subjected to "a competitive process" in which all applications are evaluated according to a series of factors and compared to each other.  *Id.* § 609.7(a)–(b).  To facilitate this process, prior to accepting applications for a loan guarantee, the DOE issues public solicitations for specific types of projects that it is looking to support, and it entertains LG Program applications pursuant to that solicitation.  *Id.* § 609.3(a).  For example, Plaintiff Limnia submitted the LG Program application that is at issue in the instant case in response to a DOE solicitation in June of 2008 for loan guarantee applications related to "projects in the United States that employ energy efficiency, renewable energy, and advanced transmission and distribution technologies[.]"  U.S.

Dep't of Energy, DE-FOA-0000005, Loan Guarantee Solicitation Announcement 2 (2008) ("LG Solicitation Announcement").  The solicitation set a deadline of February 26, 2009, for any such applications, and noted that "[a]ll applicants must remit twenty-five percent (25%) of the application fee . . . upon submission of their applications to [the] DOE."  *Id.* at 7.  The solicitation also provided a schedule to determine the particular fee amount for each applicant, advising applicants "to make proper arrangements to assure that Treasury receives such fees on behalf of DOE by the dates specified[,]" and including instructions for the wire transfer.  *Id.* at 9; *see also id.* at 59 (providing details for wire transfer).[3]

### B.    The Facts Of The Instant Case

Plaintiffs' complaint makes various assertions of fact regarding the circumstances surrounding the DOE's consideration and processing of XPV's ATVM loan application and Limnia's ATVM Loan Program and LG Program applications. These allegations, many of which are related below, must be accepted as true for the purpose of evaluating Defendants' motions to dismiss.

#### 1.   XPV's ATVM Loan Application

XPV is a now-dissolved "green technology" company that applied for an ATVM loan in December of 2008, seeking to fund the research and development of "an advanced technology, family-friendly SUV-style vehicle[.]"  (Am. Compl., ECF No. 26, ¶¶ 1, 3, 14.)  XPV's application asserted that its proposal fulfilled the requirements of

---

[3] The application fee for this specific solicitation varied according to the size of the loan guarantee being requested.  *See* LG Solicitation Announcement at 12.  According to the solicitation, the application fee for a loan guarantee up to $150 million was $75,000.  *See id.*  Thus, an applicant for a loan guarantee of this size would need to remit at least $18,750 (totaling 25% of the total application fee owed) at the time the application was submitted.  *See id.*

the DOE's ATVM Loan Program because XPV planned to used "polymer plastics and skinned expanded foam pressure membranes to replace metal doors, body panels, hoods and roofs on a lightweight alloy frame[,]" and in so doing, XPV would produce an extremely light-weight vehicle that was also safe in operation because it employed "wraparound, pre-deployed 'airbag'" technology.  (*Id.* ¶ 17.)

According to the complaint, on December 2, 2008, Defendant Seward—the director of the ATVM Loan Program at that point in time—"acknowledged receipt" of XPV's application and "requested additional information[,]" which XPV provided.  (*Id.* ¶ 22.)  Then, on December 31, 2008, Seward allegedly sent a letter to XPV indicating that XPV's application was "substantially complete" (*id.* ¶ 22; Ex. 2 to Am. Compl., ECF No. 26-1, at 11), which led XPV to believe that the DOE had deemed XPV a "qualified applicant" such that the agency "would begin processing XPV's ATVM Loan Program application . . . no later than the end of December 2008, and that the review would take a matter of weeks, consistent with normal commercial lending practices" (Am. Compl. ¶¶ 23–24).  Instead, XPV alleges that its application was "'set-aside' in favor of applications from politically-connected government cronies [because] Defendants had 'fixed' the ATVM Loan Program process to benefit political donors" (*id.* ¶ 26), as explained further below.

The complaint asserts that, beginning in the spring of 2009—approximately four months after XPV submitted its ATVM loan application—XPV had a series of interactions with the DOE relating to the status of XPV's ATVM loan application. First, Plaintiffs allege that, on April 23, 2009, the DOE's Chief of Staff and Senior Investment Officer, Jason Gerbsman, notified XPV that its "substantially complete"

application had "been assigned to both a technical eligibility and merit review team, as well as a financial viability analysis team[,]" and that "[t]he technical team is very close to finishing their evaluations on both eligibility and project merit, and the financial team will be launching a more detailed and interactive due diligence phase of the XPV application review very soon." (*Id.* ¶ 27 (alteration omitted).) This communication was allegedly followed by an offer of an in-person meeting to "discuss 'next steps'" (*id.* ¶ 28); then, on May 28, 2009, Gerbsman purportedly met with an XPV representative, at which point Gerbsman allegedly told XPV that "'everything looked good'" and that its application was "'fully compliant and [had] passed technical review'" (*id.* ¶¶ 29). Furthermore, according to the complaint, the DOE also declined to provide XPV with the same types of "special assistance" with the application process that it gave XPV's competitors during this period because, "as DOE staff put it, XPV's application was so good that special assistance was unnecessary." (*Id.* ¶ 31; *see also id.* ¶ 36 (alleging that the DOE staff made optimistic statements to XPV over a seven-week period beginning in June of 2009).)

Notwithstanding the reassurances that members of the DOE staff allegedly provided to XPV during the application process, the DOE denied XPV's ATVM loan request on August 21, 2009. (*Id.* ¶ 37.) The rejection letter, which Defendant Seward signed (and which XPV has filed as an exhibit to the complaint) asserted that the DOE was "not in a position to [make an] award [to] every eligible application[,]" and suggested that the XPV's application did not pass the DOE's merit review. (Ex. 3 to Am. Compl., ECF No. 26-1, at 13; *see also* Am. Compl. ¶ 38.)[4]  Seward further

---

[4] Page numbers throughout this Opinion refer to those that the Court's electronic filing system assigns.

explained generally that "the program [must] choose applications that are mostly likely to use the limited loan proceeds in a way that will best achieve the goals of the program." (Ex. 3 to Am. Compl. at 13.)

XPV alleges that it immediately requested both a statement regarding the specific grounds for the agency's denial of its application and a copy of the DOE's merit review documents. (Am. Compl. ¶¶ 39, 40.) XPV also allegedly placed a phone call to the DOE within five days of the denial (*id.* ¶ 42); according to the complaint, the DOE staff person with whom the XPV representative spoke pulled the company's application file and orally provided myriad reasons for the denial, none of which XPV believed was valid (*id.* ¶¶ 43–45).[5] The complaint also alleges that, during this phone conversation, Defendant Seward entered the room and cut the conversation off abruptly, directing the staff person to tell XPV that the DOE would send a letter to XPV outlining more fully the reasons that its loan application was denied. (*Id.* ¶ 52.)

The complaint alleges that no such letter was forthcoming. (*Id.* ¶ 53.) Thus, on September 21, 2009—approximately one month after the denial letter issued—XPV sent the DOE a written request for reconsideration of the denial of its ATVM loan application. (*Id.* ¶ 54; Ex. 4 to Am. Compl., ECF No. 26-1, at 15.) In this written request, XPV pointed out that the reasons for the denial that the DOE staffer had provided on the phone were contrary to the information in XPV's application (Ex. 4 to Am. Compl. at 15), and XPV also asked the DOE to respond to a list of fifteen specific questions pertaining to its review of XPV's application (*id.* at 16–18).

---

[5] The complaint states that a variety of reasons were provided for the denial of XPV's application, including that XPV's proposed vehicle did not use E85 gasoline; XPV did not plan for government fleet sales; and XPV's advanced technology was "too futuristic" and not adequately developed. (*Id.*)

Approximately one month later, on October 23, 2009, Seward responded in writing to XPV's reconsideration request, providing a more detailed explanation for the denial of XPV's application.  (*See* Am. Compl. ¶¶ 55–63; Ex. 5 to Am. Compl., ECF No. 26-1, at 21.)  The Seward letter did not claim that XPV had failed to meet any of the eligibility requirements set forth in the ATVM Loan Program's regulations (Am. Compl. ¶ 64), and it thus seemingly addressed the merits of XPV's proposal.  Seward explained that XPV's proposed technology "appeared from the application to be at a development stage and not yet ready for commercialization[,]" which was a "significant weakness[.]"  (Ex. 5 to Am. Compl. at 21.)  Moreover, the project's "impact on fuel economy . . . was determined to be weak"; the storage system for hydrogen was "unproven and potentially impractical for a consumer vehicle"; and the company's "claims for reductions in petroleum use . . . were deemed to be unrealistic[.]"  (*Id.*)

### 2. Limnia's ATVM Loan Application

Limnia is a green technology company that, unlike XPV, is still in operation. (*Id.* ¶¶ 2–3.)  Limnia filed a loan application through the ATVM Loan Program in February of 2009 to produce an "advanced technology vehicle energy storage system"— *i.e.*, a vehicle battery.  (*Id.* ¶ 68.)  Limnia and XPV are sister companies, and Limnia's proposed energy storage system was the power source for XPV's proposed lightweight SUV.  (*Id.* ¶¶ 3, 12, 68.)

The DOE rejected Limnia's ATVM application on April 10, 2009, on the ground that Limnia's energy storage system was a stand-alone charging station, not equipment to be installed in a vehicle, and thus was not a "qualifying component" under 42 U.S.C. § 17013(d)(1).  (*Id.* ¶ 69; Ex. 6 to Am. Compl., ECF No. 26-1, at 24.)  Limnia requested reconsideration of this determination, noting that its energy storage system did, in fact,

have to be installed inside a vehicle in order to be used, and that it actually was designed for this purpose. (*Id.* ¶ 70.) On May 13, 2009, the DOE rejected Limnia's ATVM loan application for a second time, giving Limnia the same reason that it had proffered in the first denial. (*Id.* ¶ 71.) The DOE did, however, request further information from Limnia that would allow it to reevaluate Limnia's application. (*Id.*; Ex. 8 to Am. Compl., ECF No. 26-1, at 30–31.) According to the complaint, Limnia responded to this letter on June 3, 2009, by providing the requested information and seeking reconsideration of its application once again. (Am. Compl. ¶ 72.) Plaintiffs allege that, as of the time the instant complaint was filed, the DOE had not responded to Limnia's request for another review. (*Id.* ¶¶ 71–73.)

3.   Limnia's LG Program Application

Around the same time that Limnia applied for an ATVM loan, it also applied for an LG Program loan guarantee, pursuant to the aforementioned solicitation that the DOE published in June of 2008. (*Id.* ¶ 77.) Plaintiffs allege that, prior to Limnia's submission of its application in February of 2009, then-Secretary Chu had stated in a conference call that the graduated LG Program fees "were unduly onerous and burdensome[,]" and had "promised to waive the application fee." (*Id.* ¶ 76.) Due to that representation, Limnia did not submit the fee (or any portion thereof) along with its LG Program application. (*Id.* ¶ 77.)

According to the complaint, on February 26, 2009—the day of the application deadline—a DOE official called Limnia to warn that the DOE would not consider Limnia's application without the fee. (*Id.* ¶ 78.) Limnia was unable to remit the fee by the midnight deadline (*id.* ¶ 79), and according to the complaint, the following day, another DOE official told Limnia that there were "a few days of flexibility" to send in

the fee, and promised to send written instructions for sending the fee (*id.* ¶¶ 80–81).

That official allegedly never got back to Limnia, despite Limnia's best efforts to follow

up.  (*Id.*)  Then, on April 9, 2009, the DOE sent Limnia an email informing Limnia that

its LG Program application would not be considered because Limnia failed to pay the

required application fee.  (*Id.* ¶ 82; Ex. 10 to Am. Compl., ECF No. 26-1, at 39.)

    4.  <u>Plaintiffs' Allegations Regarding Political Favoritism And The GAO
       Report</u>

At the heart of the complaint is Plaintiffs' contention that the various reasons the

DOE provided for denying XPV's and Limnia's loan applications were "baseless

pretexts" for political cronyism.  (Am. Compl. ¶ 118(i).)  In a nutshell, Plaintiffs assert

that "[p]olitics and political pressure infected [the ATVM and LG] programs, shaping,

in whole or in part, the judgment of the agency's ultimate decision makers, including

Defendants Chu and Seward, their staffs, advisors and consultants."  (*Id.* ¶ 84.)

Plaintiffs maintain that they became aware of the inequitable manner in which

the agency was operating these loan programs in a variety of ways—and even prior to

the denials at issue.  For example, according to the complaint, Plaintiffs first got wind

of possible unfair dealing during a June 2009 conversation with an unnamed corporate

executive, who allegedly said his company had "been 'screwed over' by DOE" and

asserted that DOE employees were "playing favorites with government money."  (*Id.*

¶¶ 32–33.)  Plaintiffs also allegedly watched as the DOE appeared to provide XPV's

competitors Tesla Motors, Inc. and Fisker Motors, Inc. "special assistance" with the

application process—*e.g.*, giving Fisker "extraordinary access to DOE staff time" and

providing "offices and conference rooms in DOE's headquarters at no charge"—while

denying XPV these same resources.  (*Id.* ¶¶ 30–31.)  Additionally, Plaintiffs claim that

a member of Tesla's board, who was also a "major campaign contributions 'bundler' for the White House[,]" was on "a key DOE advisory board" (*id.* ¶ 91), and another "accomplished campaign contribution 'bundler'" was a "Tesla investor and advisor" who had a "primary role" in the DOE's Loan Program Office (*id.* ¶ 92).  According to the complaint, the political contributions of these two "patrons" purportedly resulted in Tesla's "favorable treatment" by the DOE with respect to the loan application process (*id.* ¶ 93); therefore, Plaintiffs suggest that it was no wonder that the DOE ultimately "gave Tesla $465 million of taxpayer funds at an interest rate of 1.6% and on extremely favorable, below-market terms[.]" (*Id.* ¶ 34.)  Plaintiffs also allege that similar preferential treatment was afforded to Fisker, a company whose "patrons" allegedly had made large donations to the Obama campaign and other Democratic causes.  (*Id.* ¶ 100.)  The complaint suggests that these donations effectively purchased political influence, which was allegedly a "material factor[]" in the DOE's decision to grant an ATVM loan to Fisker despite a litany of Fisker failures.  (*Id.* ¶¶ 101, 103–09.)

Plaintiffs also point to a number of emails from DOE officials, and assert that this correspondence indicates that the DOE was under political pressure to approve particular loan applications.  (*See id.* ¶¶ 112–13.)  For example, one email suggests that the DOE's review of a loan applicant was sped up as a result of pressure from then-House Majority Leader Steny Hoyer.  (*See* Ex. 19 to Am. Compl., ECF No. 26-1, at 200.)  Another email indicates that the White House made an effort to encourage the DOE to hasten review of another loan application.  (*See* Ex. 14 to Am. Compl., ECF No. 26-1, at 189.)  Plaintiffs claim that these and other emails demonstrate that "Defendants bent the rules for political favorites[.]"  (Am. Compl. ¶ 113.)

15

Finally, Plaintiffs insist that this anecdotal evidence of political favoritism regarding the DOE's loan practices was confirmed in February of 2011 and March of 2012, when the Government Accountability Office ("GAO") issued two reports regarding the DOE's implementation of the ATVM Loan Program and LG Programs. (*See* U.S. Gov't Accountability Office, Department of Energy: Advanced Technology Vehicle Loan Program Implementation Is Under Way, But Enhanced Technical Oversight And Performance Measures Are Needed ("GAO ATVM Report"), Ex. 11 to Am. Compl., ECF No. 26-1, at 42–80; U.S. Gov't Accountability Office, DOE Loan Guarantees: Further Actions Are Needed to Improve Tracking and Review of Applications ("GAO LG Program Report"), Ex. 13 to Am. Compl., ECF No. 26-1, at 130–187.)[6]  The GAO ATVM Report, which is attached to Plaintiffs' complaint, concluded that the ATVM Loan Program had successfully "injected significant funds into the U.S. automotive industry" (GAO ATVM Report at 70), but the report also flagged two areas of concern: first, that the DOE lacked the necessary technical expertise to oversee the progress of companies that had received ATVM loans (*id.*), and second, that the DOE lacked certain "quantifiable performance measures[,]" particularly in the context of fuel economy standards (*id.* at 70–71).  Both of these GAO-identified deficiencies related to the back-end of the ATVM Loan Program—*i.e.*, they were concerns regarding the DOE's monitoring of successful loan applicants, rather than its selection of loan recipients in the first place.

---

[6] The GAO is "the audit, evaluation, and investigative arm of Congress" that "exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people."  (GAO ATVM Report at 80.)

By contrast, the GAO's LG Program report focused on implementation problems related to the application stage.  The GAO noted that the DOE did not have access to consolidated data about past and present LG Program applications, which made it difficult for the DOE to review and identify problems within the application process. (GAO LG Program Report at 152–54.)  Additionally, the GAO found that although the DOE had established a comprehensive process for reviewing and granting LG Program applications, that process had been applied inconsistently in practice.  (*Id.* at 155.)  For example, the GAO had reviewed the application process for a number of successful applicants, and it found that the agency's actual application review practices differed in at least one respect from the process outlined in the DOE's LG Program guidance manuals in almost every case.  (*See id.* at 156–60.)  The GAO acknowledged the DOE's contention that these apparent inconsistencies were caused by out-of-date manuals and were not due to any error or intentional action on the part of DOE staff, but the GAO cautioned that the disconnect between the published review processes and the actual review practices could undermine the DOE's assurance that all LG Program applicants are "treated . . . consistently and equitably."  (*Id.* at 163.)

The instant complaint seizes on the GAO's critiques, repeatedly referencing the two reports and asserting that the GAO's conclusions support Plaintiffs' cronyism accusations.  (*See* Am. Compl. ¶¶ 85–88, 110–11.)  According to Plaintiffs, the problems that the GAO identified in the ATVM report in particular—*e.g.*, the DOE's lack of technical expertise and its use of inadequate performance measures in evaluating the performance of successful ATVM applicants—"facilitated the politicization of DOE's loan programs."  (*Id.* ¶ 88.)  And, in Plaintiffs' view,  the GAO's LG Program

report establishes that the DOE treated applicants inconsistently, by "favoring some [applicants] and disadvantaging others[.]" (*Id.* ¶ 111.)

## C.    Procedural History

Plaintiffs filed the initial complaint in the instant case on January 10, 2013; an amended complaint followed, on August 20, 2013.[7] Plaintiffs bring seven claims for relief: two Fifth Amendment Due Process claims (one against the DOE and Muniz, *i.e.*, the "Official Capacity Defendants," and another against Chu and Seward, *i.e.*, the "Individual Capacity Defendants"); two Fifth Amendment Equal Protection claims (also one against each of the two defendant types); and three APA claims (one brought by XPV related to the DOE's processing of its ATVM loan application, and two brought by Limnia related to the agency's consideration of each of its two loan applications).

With respect to the four constitutional claims, Plaintiffs contend that the DOE's failure to engage in a fair merits review of Plaintiffs' applications and its improper consideration of political contributions and influence resulted in the deprivation of a constitutionally-protected property interest—the requested ATVM loans—and subjected Plaintiffs to discriminatory treatment, in violation of their Fifth Amendment rights to

---

[7] This is the second lawsuit that these plaintiffs have filed in federal court arising out of the DOE's denial of their loan applications—the first was an action brought against the United States that was filed in the U.S. Court of Federal Claims on November 14, 2012. (*See* Compl., *XP Vehicles, Inc. v. United States*, No. 12-cv-774 (Fed. Cl. Nov. 14, 2012), ECF No. 1.) In the complaint filed in that case, as amended, Plaintiffs sought $450 million in damages (*see* Am. Compl., *XP Vehicles, Inc. v. United States*, No. 12-cv-774 (Fed. Cl. Oct. 16, 2013), ECF No. 35, ¶ 30), and brought claims for equitable estoppel against the United States with respect to XPV and Limnia's ATVM loan applications (*id.* ¶¶ 119–28); promissory estoppel against the United States regarding Limnia's LG Program application arising out of Limnia's reliance on Chu's alleged promise to waive the application fee (*id.* ¶¶ 129–34); breach of an implied-in-fact contract for the fair review of both companies' ATVM loan applications (*id.* ¶¶ 135–42); and breach of the duty of good faith and fair dealing (*id.* ¶¶ 143–46). The United States moved to dismiss the action in its entirety (*see* Def.'s Mot. to Dismiss Am. Compl., *XP Vehicles, Inc. v. United States*, No. 12-cv-774 (Fed. Cl. Dec. 16, 2013), ECF No. 36), and the court granted this motion on June 5, 2014, *see XP Vehicles, Inc. v. United States*, No. 12-774C, 2015 WL 3543629, at *16 (Fed. Cl. June 5, 2015).

due process and equal protection.  (*See id.* ¶¶ 130–32, 145, 148*; see also* Am. Compl.
¶¶ 121–36 (Claim 1); *id.* ¶¶ 137–141 (Claim 2); *id.* ¶¶ 142–48 (Claim 3); *id.* ¶¶ 149–154
(Claim 4).)  As noted, Plaintiffs make these constitutional claims against both groups of
Defendants, requesting injunctive relief with respect to the Official Capacity
Defendants and seeking $225 million in damages from the Individual Capacity
Defendants for these alleged civil rights violations (*id.* at 32–33).

As for the APA claims, Plaintiffs argue that the Official Capacity Defendants
acted arbitrarily and capriciously when the DOE denied XPV's ATVM loan application
(*id.* ¶¶ 155–60 (Claim 5)), Limnia's ATVM loan application (*id.* ¶¶ 161–66 (Claim 6)),
and Limnia's LG Program application (*id.* ¶¶ 167–71 (Claim 7)).  Plaintiffs allege that
the DOE's rejection of each application constituted "final agency action" for the
purposes of the APA (*id.* ¶¶ 156, 162, 168), and that its decision making process was
"impermissibly infected with political pressure, which shaped, in whole or in part," the
ultimate agency decision (*id.* ¶¶ 157, 163, 169).  Plaintiffs seek an order declaring that
their loan applications were wrongfully denied and directing the DOE to reconsider
their applications.  (*Id.* at 33.)

On September 18, 2013, Defendants filed two separate motions to dismiss—one
on behalf of the Official Capacity Defendants and the other on behalf of the Individual
Capacity Defendants.  (*See* Official Capacity Defs.' Mot. to Dismiss ("Off. Defs.'
Mot."), ECF No. 28; Individual Fed. Defs.' Mot. to Dismiss & Inc. Mem. of Law
("Indiv. Defs.' Mot."), ECF No. 27.)  These motions seek dismissal under Federal Rules
of Civil Procedure 12(b)(1) and 12(b)(6).  Defendants' first line of attack challenges
this Court's jurisdiction to reach the merits of a number of Plaintiffs' claims.  First,

19

Defendants argue that, to the extent that Plaintiffs are attempting to recover monetary damages against a government agency or government officials in their official capacity, such damages are barred by sovereign immunity. (*See* Official Capacity Defs.' Mem. in Supp. of Off. Defs.' Mot. ("Off. Defs.' Mem."), ECF No. 28, at 19–20.) Defendants also argue that Limnia's ATVM Loan Program claims (both the constitutional and the APA variety) are unripe (*see id.* at 23–27), and that both Plaintiffs lack standing to bring certain claims (*see id.* at 20–23, 27–28). With respect to the merits of Plaintiffs' four constitutional claims, Defendants maintain that Plaintiffs have failed to state a claim for a violation of their Fifth Amendment rights to due process or equal protection. (Off. Defs.' Mem. at 30–33; Indiv. Defs.' Mot. at 43–47.) Defendants also argue that XPV lacks the capacity to sue for injunctive relief. (*See* Off. Defs.' Mem. at 28–29; Indiv. Defs.' Mot. at 25 n.16.) And the Individual Capacity Defendants argue that Plaintiffs constitutional claims against them are barred by the statute of limitations (*see* Indiv. Defs.' Mot. at 25–29); that a *Bivens* action (permitting the recovery of damages from public officials for constitutional violations) has not yet been established in this context and should not be extended to encompass Plaintiffs' constitutional claims (*see id.* at 29–31); and that, in any event, the Individual Capacity Defendants are protected from liability by qualified immunity (*id.* at 41–43). Finally, with respect to Plaintiffs' APA claims in particular, the Official Capacity Defendants assert that there has been no final agency action with respect to Limnia's ATVM loan application (*see* Off. Defs.' Mem. at 29–30), and that Plaintiffs have not adequately alleged a violation of the APA with respect to Limnia's LG Program application (*see id.* at 33–35).

This Court held oral argument on Defendants' motions to dismiss on April 3, 2014, and it took the motions under advisement at that time.

## II.   LEGAL STANDARDS

### A. Motions To Dismiss Under Rule 12(b)(1)

The defense of sovereign immunity relates to a federal court's jurisdiction, *see Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003); thus, a request for dismissal on sovereign immunity grounds is properly evaluated under Rule 12(b)(1), *see Mullen v. Bureau of Prisons*, 843 F. Supp. 2d 112, 116 (D.D.C. 2012). Similarly, when a plaintiff lacks standing, or when the plaintiff's claims are not ripe, dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction is the proper course. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("[T]he defect of standing is a defect in subject matter jurisdiction."); *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 154 (D.D.C. 2011) ("The issue of ripeness falls under Rule 12(b)(1).").

In response to a Rule 12(b)(1) motion to dismiss, "the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *Halcomb v. Office of the Senate Sergeant-at-Arms of the U.S. Senate*, 209 F. Supp. 2d 175, 176 (D.D.C. 2002). The court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Moreover, the court must accept as true all of the factual

allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, *see Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008), but it need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations[,]" *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001). Furthermore, "[t]he court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011).

**B.  Legal Standard On A Motion To Dismiss Under Rule 12(b)(6)**

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint[.]" *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  The plausibility standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "[W]hile 'detailed factual allegations' are not necessary, the plaintiff must provide 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Schmidt*, 826 F. Supp. 2d at 65 (quoting *Iqbal*, 556 U.S. at 678).

In deciding whether to dismiss a complaint for failure to state a claim under Rule 12(b)(6), the court generally does *not* consider matters beyond the pleadings, which differs from the court's treatment of a motion to dismiss under Rule 12(b)(1). *See Ward*

*v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119–20 (D.D.C. 2011).  In

the Rule 12(b)(6) context, the court only considers "the facts alleged in the complaint,

documents attached as exhibits or incorporated by reference in the complaint, or

documents upon which the plaintiff's complaint necessarily relies[.]"  *Id.* at 119

(internal quotation marks and citation omitted).  The court "must treat the complaint's

factual allegations—including mixed questions of law and fact—as true and draw all

reasonable inferences therefrom in the plaintiff's favor."  *Epps v. U.S. Capitol Police*

*Bd.*, 719 F. Supp. 2d 7, 13 (D.D.C. 2010) (citing *Holy Land Found. for Relief & Dev. v.*

*Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003)).  However, the court need not accept as

true inferences unsupported by the facts set out in the complaint or legal conclusions

cast as factual allegations.  *See Browning*, 292 F.3d at 242.

## III.  ANALYSIS

As explained above, XPV and Limnia allege that impermissible political

favoritism and cronyism infected the DOE's implementation of the ATVM Loan

Program and the LG Program, and resulted in the unwarranted and arbitrary denial or

rejection of their respective loan applications in a manner that violated Plaintiffs' Fifth

Amendment rights to due process and equal protection and that also transgressed the

APA.  Defendants' first line of attack against the advancement of these claims is a

series of jurisdictional arguments.  (*See, e.g.*, Off. Defs.' Mem. at 23–27 (asserting that

Limnia's ATVM Loan Program claims are unripe); *id.* at 27–28 (asserting that Limnia

lacks standing to bring its ATVM Loan Program claims); *id.* at 20–23 (asserting that

XPV lacks standing to sue for injunctive relief because it is a dissolved corporation).)

For the reasons explained below, however, this Court concludes that none of the

asserted jurisdictional roadblocks prevents the Court from reaching the merits of Plaintiffs' claims.

Nevertheless, the Court has determined that all of XPV's claims and most of Limnia's claims must be dismissed pursuant to Rule 12(b)(6), for a variety of reasons. XPV's due process, equal protection, and APA claims against the Official Capacity Defendants must be dismissed because XPV is a dissolved corporation that lacks the capacity to sue for injunctive relief. In addition, XPV's due process and equal protection claims against the Individual Capacity Defendants fail as a matter of law because no *Bivens* action is available for these alleged civil rights violations under the circumstances presented here, and as a result, claims for monetary damages cannot be brought against these defendants. Limnia's constitutional claims suffer a similar fate: the lack of a *Bivens* action requires dismissal of Limnia's constitutional claims against the Individual Capacity Defendants, and the constitutional claims against the Official Capacity Defendants must be dismissed because Limnia fails to state facts that adequately support any such claim. However, this Court concludes that Limnia may proceed with its APA claims regarding the denial of both its ATVM loan application and its LG Program application because the complaint contains allegations that, if true, are sufficient to establish that the Official Capacity Defendants acted arbitrarily and capriciously in handling those applications.

**A. This Court Has Jurisdiction Over The Claims In Plaintiffs' Complaint**

When a defendant challenges a federal court's jurisdiction, the court is obligated to consider the jurisdictional objections before reaching the merits of any claim. *See Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006) ("The first and fundamental question that we are bound to ask and answer is whether the court has jurisdiction to

24

decide the case." (internal quotation marks and citation omitted)); *see also Steel Co. v.
Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that
jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of
the judicial power of the United States' and is 'inflexible and without exception.'"
(alteration in original) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379,
382 (1884))).  As mentioned above, Defendants make several jurisdictional arguments
in this case.  Setting aside Defendants' sovereign immunity argument (*see* Off. Defs.'
Mem. at 19–20)—the inapplicability of which was made clear when Plaintiffs' counsel
clarified during this Court's hearing that monetary damages were not being sought
against the Official Capacity Defendants—Defendants' jurisdictional contentions are
(1) that Limnia's claims with respect to the administration of the ATVM Program are
not ripe (*see id.* at 23–27); (2) that Limnia lacks standing to seek relief related to the
denial of its ATVM loan application because it has not been injured by that denial (*see
id.* at 27–28); and (3) that XPV lacks standing to bring claims for injunctive relief (*see
id.* at 20–23).  These jurisdictional arguments are unavailing for the reasons that follow.

      1.  Limnia's ATVM Loan Program Claims Are Ripe

The reasons that Defendants give for challenging on ripeness grounds the
constitutional and APA claims that Limnia brings with respect to its ATVM loan
application are easy to summarize: Defendants maintain, first, that because the DOE
rejected Limnia's application at the initial screening stage of the review process and did
not consider *the merits* of Limnia's ATVM application, Limnia's claims regarding the
DOE's treatment of its application are not yet ripe—in other words, that any legal
claims challenging the agency's determination regarding an applicant's ATVM loan
application ripen only when the agency addresses the application's merits (*see id.* at

25–27)—and second, that Limnia has requested that the DOE *reconsider* its denial of

Limnia's LG Program application, and that request is still pending before the DOE, so

any attempt to challenge the DOE's actions at this point is "incurably premature" (*id.* at

23–25).   These arguments invite this Court to examine Limnia's claims through the lens

of the "ripeness" doctrine, which is a jurisdictional principle "designed 'to prevent the

courts, through avoidance of premature adjudication, from entangling themselves in

abstract disagreements over administrative policies, and also to protect the agencies

from judicial interference until an administrative decision has been formalized and its

effects felt in a concrete way by the challenging parties.'"   *Nat'l Park Hospitality Ass'n*

*v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*,

387 U.S. 136, 148–49 (1967)).

It is well established that, to determine whether or not a claim is ripe, a court

must "evaluate (1) the fitness of the issues for judicial decision[,] and (2) the hardship

to the parties of withholding court consideration."   *Nat'l Park Hospitality Ass'n*, 538

U.S. at 808.   The "fitness" prong is often the heart of the matter, and whether or not a

claim is fit for judicial determination turns on three factors: "whether [the issue] is

purely legal, whether consideration of the issue would benefit from a more concrete

setting, and whether the agency's action is sufficiently final."   *Am. Petroleum Inst. v.*

*EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (internal quotation marks and citation

omitted).   Here, it is clear that the questions Limnia raises—*i.e.*, whether the DOE's

rejection of its ATVM loan application violated the Fifth Amendment, and/or was

arbitrary and capricious—are purely legal inquiries.   *See Atl. States Legal Found. v.*

*EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) ("Claims that an agency's action is arbitrary

and capricious or contrary to law present purely legal issues."); *Beach Commc'ns, Inc. v. FCC*, 959 F.2d 975, 986 (D.C. Cir. 1992) (holding that an equal protection claim presents a purely legal question).  And Defendants cannot credibly contend that these legal issues would benefit from further development such that another setting would be more appropriate for the resolution of Liminia's claims than this Court.  *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 381 (D.C. Cir. 2002) (finding a challenge to agency action ripe where "nothing would be gained by delaying review"); *see also State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 484 (D.C. Cir. 1986) (finding a case not yet ripe because "it would be helpful to the court to see" the way in which the challenged rule "actually operates in practice").  Therefore, it is clear that what is actually animating Defendants' ripeness argument with respect to Limnia's claims is Defendants' ardent assertion that the agency's consideration of Limnia's ATVM loan application has never reached the merits review stage and thus is not yet "final" (the third fitness factor). (*See* Off. Defs.' Mem. at 26 ("At this stage, however, claims regarding Limnia's ATVM loan application are not 'sufficiently final,' and therefore are not fit for judicial review.").)

Specifically, as mentioned, Defendants maintain that the "final agency action" factor of the ripeness inquiry is a hurdle that has not been cleared with respect to the agency's treatment of Limnia's ATVM application because the DOE has not made a decision on the merits of Limnia's application and also because there is a pending motion for reconsideration of the DOE's initial denial.  (*See id.* at 23–27.)  Thus, in essence, Defendants' argument requires this Court to address two related aspects of the DOE's determination, each of which implicates the ultimate "final agency action"

inquiry—first, has there really been cognizable agency "action" for ripeness purposes, if the DOE's determination relates only to the initial (screening) stage of the loan application review process and not the merits?; and if so, second, can the DOE's action with respect to Limnia's application properly be characterized as "final" given the fact that Limnia has requested further consideration by the agency?  For the reasons that follow, this Court finds that the answer to both of these questions is yes, and it therefore concludes that Limnia has satisfied the final agency action factor of the ripeness test.

> a.     *The DOE's Denial Of Limnia's ATVM Loan Application Is Sufficiently Final Even Though The DOE Did Not Consider The Merits Of That Application*

Defendants argue that the DOE's decision to reject Limnia's ATVM loan application is not "sufficiently final" because the DOE has not yet "conducted a substantive review of Limnia's application."  (Off. Defs.' Mem. at 26.)  But ripeness doctrine does not require that an agency reach and determine the underlying merits of an application or petition—as distinguished from making a determination regarding initial eligibility criteria—so long as the agency has made a final and unequivocal decision with respect to what it does review, such that its determination represents the consummation of the agency's decision making process and establishes legal rights and obligations or fixes a legal relationship.  *See Nat'l Mining Ass'n*, 758 F.3d 243, 250 (D.C. Cir. 2014) ("An agency action is final only if it is *both* 'the consummation of the agency's decisionmaking process' *and* a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" (quoting *Bennett v.*

*Spear*, 520 U.S. 154, 177–78 (1997))).[8]  An agency action reflects the consummation of

the agency's decision making process when the action is "definitive[,]" *Fourth Branch*

*Assocs. (Mechanicville) v. FERC*, 253 F.3d 741, 746 (D.C. Cir. 2001) (quoting *Ciba-*

*Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986)), and is not "tentative,

open to further consideration, or condition[ed] on future agency action[,]" *City of Dania*

*Beach, Fla. v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007).   Furthermore, it is clear

beyond cavil that the rejection of a request for a government benefit—such a loan or a

loan guarantee—"fixes some legal relationship" between a private party and the

government.  *Meredith v. Fed. Mine Safety & Health Review Comm'n*, 177 F.3d 1042,

1047 (D.C. Cir. 1999); *see also Detroit Int'l Bridge Co. v. Canada*, No. 10-cv-476,

2014 WL 2257137, at *13 (D.D.C. May 30, 2014) (noting that denial of a permit

application constitutes final agency action).

     The DOE's denial of Limnia's ATVM loan application plainly satisfies these

requirements, notwithstanding the fact that, according to the complaint, the denial

occurred at the initial stage of the DOE's application review process.  Plaintiffs allege

that the DOE first rejected Limnia's application for an ATVM loan on April 10, 2009

(*see* Am. Compl. ¶ 69), based on the agency's allegedly mistaken determination that

Limnia's "proposed project cannot, as a matter of law, be funded under the Program"

because it is a component that "do[es] not appear to be designed for installation in an

advanced technology vehicle" (Ex. 6 to Am. Compl. at 24–25).  After Limnia requested

---

[8] Courts typically have considered whether or not agency action is "final" in the context of an evaluation of the APA's "final agency action" requirement.  *See* 5 U.S.C. § 704.  However, this same jurisprudence has been adopted as applicable to the fitness prong of the ripeness analysis.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967) (considering final agency action in the context of ripeness); *Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) ("Final agency action pursuant to the [APA] is a crucial prerequisite to ripeness[.]" (internal quotation marks and citation omitted)).

reconsideration and provided additional documentation, the DOE sent Limnia a letter

dated May 13, 2009, in which the agency stated that "the additional information has not

changed our determination that your proposed project cannot, as a matter of law, be

funded under the Advanced Technology Vehicles Manufacturing Incentive Program[.]"

(Ex. 8 to Am. Compl. at 30.)  In this same correspondence, the agency asked Liminia

for more information (*id.* at 31; Am. Compl. ¶ 71), which Limnia apparently provided,

but the additional material apparently failed to satisfy the DOE's staff—more than two

years later, in October of 2011, the agency "sent Limnia a letter . . . stating that

Limnia's application was [nevertheless] not substantially complete[,]" (Ex. 5 to Pls.'

Off. Opp'n, ECF No. 30-6, at 2).[9]  Then, continuing the saga, the DOE sent yet another

letter to Limnia the following year, on October 23, 2012, in which the agency stated

that it had reviewed additional documents and information, and had found *once again*

that Limnia's application "is not substantially complete as required" by the applicable

regulations.  (*Id.*)  The agency further reiterated its obviously cemented position

regarding the status of Limnia's application in March of 2013, when it sent yet *another*

letter to Limnia providing "clarification on the deficiencies that rendered Limnia, Inc.'s

ATVM[ Loan Program] application not substantially complete."  (Ex. C to Off. Defs.'

Mem., ECF No. 28-1, at 8.)

This Court finds that all of these letters and statements plainly constitute a final

decision of the DOE rejecting Limnia's ATVM loan application for the purpose of the

---

[9] The letter that the DOE purportedly sent to Limnia in October of 2011 is referenced in two DOE documents, one that the Official Capacity Defendants submitted for this Court's consideration as an attachment to their motion to dismiss and one that Plaintiffs submitted as an attachment to their opposition to the Official Capacity Defendants' motion to dismiss.  (*See* Ex. 5 to Pls.' Off. Opp'n at 2; Ex. C to Off. Defs.' Mem., ECF No. 28-1, at 8.)  This Court is permitted to look beyond the complaint because ripeness is a jurisdictional issue.  *See Scolaro*, 104 F. Supp. 2d at 22.

ripeness doctrine.  The DOE stated in no uncertain terms in its letter of April 10, 2009,

that it had "carefully reviewed" Limnia's application and had "determined" that the

proposed project was not eligible to receive an ATVM loan "as a matter of law."  (Ex. 6

to Am. Compl. at 24.)  Furthermore, the agency also apparently determined that

Limnia's application was not substantially complete, and it stated that the DOE would

"take no further action with respect to your application until such time as you have

submitted an application that is substantially complete."  (Ex. 5 to Pls.' Off. Opp'n at

2.)  The series of letters from the DOE to Limnia provide no indication that the DOE's

determination regarding the status of Limnia's application is at all tentative or open to

any further reconsideration; indeed, the most recent correspondence unmistakably

pushes the ball into Limnia's court, suggesting steps that Limnia might take "[t]o aid in

completing" its application, and thereby clearly indicating that the agency would not

proceed to continue to evaluate its submission otherwise.  (Ex. C to Off. Defs.' Mem. at

8.)

   To the extent that Defendants here are suggesting that the DOE's determination

that Limnia's submission was "not substantially complete" is not tantamount to a final,

substantive *denial* of Limnia's loan request (Off. Defs.' Mem. at 26), they have two

problems—first, the mandate that this Court must construe the facts alleged in the

complaint in the light most favorable to the Plaintiffs to the extent those allegations are

consistent with evidence presented means that, at least for the purpose of the instant

motion to dismiss, it must be presumed that the DOE did, in fact, "carefully review[]"

Limnia's application as it expressly stated it had done (Ex. 6 to Am. Compl. at 24), and

that the agency "denied" that application for the substantive reasons expressed in its

letters.  (*See* Am. Compl. ¶ 69; Ex. 6 to Am. Compl. at 24–25; Ex. 8 to Am. Compl. at 30–31.)  Second, and perhaps even more important, Defendants have not provided this Court with any reason to draw any distinction between an initial completeness determination, on the one hand, and a substantive decision to deny an ATVM loan application (*e.g.*, for lack of eligibility or on the merits), on the other—and no reason is apparent, given that a rejection for lack of completeness and a substantive denial of an ATVM loan application are both the end of the road from the applicant's standpoint and have the same practical effect on the applicant's rights.  To find otherwise, as Defendants would have this Court do, would be to presume that there is some jurisdictional significance to the agency's decision to deny a loan application on the merits, as opposed to rejecting the application on some other ground that is antecedent to a merits determination, when federal courts routinely consider challenges to agency determinations regarding antecedent matters such as an agency's own ability to reach the merits of a particular dispute.  *See, e.g.*, *Daiichi Sankyo Co., Ltd. v. Rea*, 12 F. Supp. 3d 8, 14–15 (D.D.C. 2013) (reviewing Patent and Trademark Office decision that the agency could not review plaintiff's request for reconsideration because it was untimely filed); *Adirondack Med. Ctr. v. Sebelius*, No. 11-cv-313, 2012 WL 285142, at *2 (D.D.C. Jan. 31, 2012) (holding that an agency's finding that it lacks jurisdiction "constitutes final agency action, and it is properly before this Court").

In short, Defendants fail to identify a single case that supports distinguishing between the DOE's decision regarding the completeness of Limnia's application and a substantive decision on the merits as far as final agency action is concerned, and this Court sees no good reason to draw any such line, especially when the evidence indicates

that the DOE considered Limnia's application numerous times and repeatedly expressed
its determination that (for whatever reason) the proposed project would not be funded.
Thus, the mere fact that the DOE apparently did not base its rejection on the merits of
Limnia's application is not determinative of the ripeness issue; regardless, in light of
the allegations and evidence presented, the DOE's unequivocal rejection of Limnia's
ATVM loan application was a "final" action on the part of the agency.

> b.   *The Fact That Limnia Requested Reconsideration Of The
>       DOE's Determination Regarding Its ATVM Loan Application
>       Does Not Render Limnia's Challenge Unripe*

Undaunted, Defendants raise another finality objection as part of their ripeness
challenge: they maintain that there is no final agency action because Limnia has
requested reconsideration of the agency's decision and, according to the complaint, that
request is still pending; therefore, the claims that Limnia has brought here are
"incurably premature[.]" (*See* Off. Defs.' Mem. at 23; *see also* Am. Compl. ¶¶ 70–73
(alleging that Limnia repeatedly requested reconsideration of the DOE's initial
determination that its project was ineligible for funding, and that "Defendants never
responded" to Limnia's second reconsideration request).)  A line of D.C. Circuit case
law does stand for the proposition that a request for reconsideration requires a litigant
to wait for the agency to act before that litigant is permitted to file suit, *see Clifton
Power Corp. v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002), and this doctrine holds that,
even if the agency completes its reconsideration before the litigant's lawsuit is heard on
the merits, the premature lawsuit cannot proceed—hence, the "incurable" part of the
incurably premature doctrine, *see TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 134 (D.C. Cir.
1989) ("We hold therefore that when a petition for review is filed before the challenged
action is final and thus ripe for review, subsequent action by the agency on a motion for

33

reconsideration does not ripen the petition for review or secure appellate jurisdiction."); *see also Pen Peninsula Commc'ns, Inc. v. FCC*, No. 00-1079, 2000 WL 1225776, at *1 (D.C. Cir. July 11, 2000) (expressly referring to "[t]he incurably premature doctrine"). However, it is far from clear that this doctrine applies to the sort of agency decision making at issue in this case.[10]  And even if the incurably premature doctrine is applicable to the instant circumstances[,] this Court concludes that that doctrine does not render Limnia's ATVM Loan Program claims unripe for the very simple reason that the record in this case clearly demonstrates that the DOE completed the requested reconsideration *before* Limnia filed the complaint at issue here.

Specifically, as noted above, the DOE first rejected Limnia's ATVM loan application on April 10, 2009.  (Am. Compl. ¶ 69; Ex. 6 to Am. Compl. at 24–25.) Limnia responded by asking for an explanation and reconsideration.  (Am. Compl. ¶ 70.)  In response to this, the DOE affirmed its decision but gave Limnia the opportunity to submit additional information and to request reconsideration (Ex. 8 to Am. Compl. at 31), which Limnia subsequently did on June 3, 2009 (Am. Compl. ¶¶ 71–72).  Plaintiffs claim that the DOE failed to respond at all to this second request for reconsideration.  (*Id.* ¶ 73.)  And although the complaint ends the story there, the documentation that the parties have submitted establishes that the DOE did, in fact,

---

[10] The First Circuit has noted that the incurably premature analysis, which appears to have developed in the context of the types of agency action that are subject to direct review by the D.C. Circuit, has only been applied where "either the governing statute or the implementing regulations expressly provided for agency reconsideration."  *Craker v. DEA*, 714 F.3d 17, 24 (1st Cir. 2013).  Furthermore, the main concerns underlying the doctrine—"the judicial economy concerns" arising from concurrent jurisdiction—"are considerably diminished in cases . . . in which reconsideration may or may not have been permitted in the agency's discretion[,]" *id.* at 25, and thus, according to the First Circuit, the incurably premature doctrine should not be employed "where the reconsideration process is ad hoc," *id.* Because the ATVM Loan Program regulations do not provide for any formal reconsideration process, it is thus at least conceivable that the incurably premature doctrine does not even apply in cases such as this one.

respond to Limnia's 2009 reconsideration request; thereafter, it sent multiple letters, stating repeatedly that it had "thoroughly reviewed all information that was provided" to the agency, and that Limnia's application was still "not substantially complete." (Ex. 5 to Pls.' Off. Opp'n at 2.) Nothing in the record indicates that Limnia sought a *further* round of reconsideration, despite the DOE's repeated characterization of its application as incomplete and its suggestion to Limnia that the company research the program requirements and try again. (*See* Ex. C to Off. Defs.' Mem. at 8.) Thus, there is no factual basis for concluding that the agency was still engaged in any reconsideration process at the time that the complaint in this case was filed. *See TeleSTAR, Inc.*, 888 F.2d at 134. In other words, even if the Official Capacity Defendants are correct that Limnia's request for reconsideration in 2009 rendered the DOE's decision non-final at that time, the DOE's subsequent rejection of Limnia's ATVM application again—in 2012—constituted a new final agency decision with respect to which no reconsideration request apparently was made, such that Plaintiffs' filing of the instant complaint in January of 2013 was not at all premature, much less "incurably" so.

In sum, this Court concludes that Limnia's claims are fit for review because they present purely legal questions that would not benefit from resolution in a more concrete setting, and based on the evidence submitted, the DOE unequivocally rejected Limnia's ATVM loan application in a manner that constitutes final agency action despite Limnia's prior requests for reconsideration of that decision. As a result, Limnia's ATVM Loan Program claims are sufficiently ripe.[11]

---

[11] Having found that the fitness prong of the ripeness test is satisfied, this Court need not proceed to consider the second prong of the ripeness analysis. *See Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 756–57 (D.C. Cir. 2003) (stating that, where "there are no significant agency or judicial interests militating in favor of delay"—*i.e.*, where the first prong of the ripeness analysis raises no concerns—

2.  <u>Plaintiffs Have Standing To Bring Their ATVM Loan Program Claims</u>

Defendants have also questioned whether the Plaintiffs have Article III standing

to file a lawsuit challenging the manner in which the DOE handled their ATVM loan

applications.  Lack of standing is a jurisdictional issue because Article III of the

Constitution authorizes the federal courts to consider only "Cases" and

"Controversies[,]" U.S. Const. art. 3, § 2, and to demonstrate a case qualifies as such, a

plaintiff must allege an "injury in fact" that is "fairly traceable to the challenged action

of the defendant" and that is capable of being "redressed" by the Court.  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks,

alterations, and citations omitted).  Defendants maintain that Limnia lacks standing

because the complaint alleges that the DOE provided Limnia with specific reasons for

its rejection of Limnia's ATVM loan application and thus establishes that Limnia has

not been injured.  (*See* Off. Defs.' Mem. at 28.)  Defendants also assert that XPV's

alleged injury is not redressible by a decision of this Court because, as a dissolved

corporation, XPV lacks the capacity to sue for injunctive relief.  (*See* Off. Defs.' Mem.

at 20–23.)

Defendants' standing arguments are not persuasive.  First of all, the denial of

Limnia's ATVM loan application clearly qualifies as a concrete injury-in-fact, *see Care*

*Net Pregnancy Ctr. of Windham Cnty. v. U.S. Dep't of Agric.*, 896 F. Supp. 2d 98, 108

(D.D.C. 2012), and Plaintiffs' complaint adequately alleges that this denial was caused

by Defendants (*see* Am. Compl. ¶¶ 68–71).  Moreover, this injury is capable of being

---

then the second prong "cannot tip the balance against judicial review") (internal quotation marks and
citation omitted)).

redressed by court order, if the Court orders either reconsideration or reversal of the

DOE's decision, as Limnia requests. *See Am. Petroleum Tankers Parent, LLC v. United*

*States*, 943 F. Supp. 2d 59, 66 (D.D.C. 2013) (finding "vacatur of the Administrator's

denial and remand for further consideration" would adequately redress improper denial

of a loan guarantee application).  The Official Capacity Defendants' argument that

Limnia has already received the remedy it requests because the DOE reconsidered its

rejection of Limnia's application and provided "an explanation of the information

needed to submit a substantially complete application[,]" and thus Limnia has not been

injured (Off. Defs.' Mem. at 28), misunderstands Limnia's complaint, and is also belied

by the very record documents that the Official Capacity Defendants rely so heavily

upon in making their jurisdictional arguments.  That is, Limnia maintains that the

DOE's reasons for rejecting its application are, in essence, a pretext for improper

political cronyism (*see* Pls.' Mem. in Opp'n to Off. Defs.' Mot. ("Pls.' Off. Opp'n"),

ECF No 30, at 34); consequently, the DOE's "explanation" is arguably *a part of*

Limnia's alleged rejection injury, and it is certainly not the cure for that alleged harm,

as Defendants suggest.  Moreover, even if one could say that Limnia's initial rejection

was remedied (and thus redressed) when the DOE reconsidered its ATVM application

upon request, to the extent that recent correspondence between the parties demonstrates

that the DOE has now refused to continue to process Limnia's current ATVM Loan

application (*see* Ex. 5 to Pls.' Off. Opp'n at 2), the challenged agency action is

ongoing, and the alleged injury to Limnia persists.

Defendants' argument that XPV lacks standing to bring any claims against the

Official Capacity Defendants because XPV is a dissolved corporation—and as such, it

does not have the capacity to sue for injunctive relief (*see* Off. Defs.' Mem. at 20–23)—
fails because that argument relies on the mistaken premise that lack of capacity
necessarily means that an injury is not redressable for Article III standing purposes (*see
id.*).  In actuality, redressability does not involve consideration of whether a plaintiff
actually will, or even could, receive the requested relief, as Defendants' maintain;
rather, it is a theoretical concept that *assumes* that the plaintiff can and will prevail and
get relief, and considers only the extent to which requested remedy relates to the
alleged harm.  *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir.
1996) (en banc) ("Redressability examines whether the relief sought, *assuming that the
court chooses to grant it*, will likely alleviate the particularized injury alleged by the
plaintiff." (emphasis added) (footnote omitted)).  Morevoer, it is clear that arguments
related to a plaintiff's capacity to sue are not jurisdictional, and instead, relate to the
merits of a plaintiff's claims.  *See In re Krause*, 546 F.3d 1070, 1072 n.2 (9th Cir.
2008) (distinguishing the question of capacity from the question of standing); *E.R.
Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 936 (2d Cir. 1998)
("Lack of capacity is generally not considered jurisdictional[.]"); *In re Thornburgh*, 869
F.2d 1503, 1511 (D.C. Cir. 1989) ("We examine below the petitioners' assertion that no
relief is available in this case; we decline, however, to conduct that analysis under the
rubric of standing doctrine."); *see also* 6A Charles Alan Wright, Arther R. Miller &
Mary Kay Kane, Federal Practice and Procedure § 1559 (3d ed. 1998) ("To treat
capacity problems as subject-matter jurisdiction defects seems to exaggerate their
significance[.]").  This means that XPV is not disqualified from having Article III
standing on the basis of its purported lack of capacity, and this Court finds that

Plaintiffs' complaint satisfies the criteria for XPV's standing for the same reasons that Limnia has standing—XPV is alleged to have suffered a concrete injury-in-fact that was caused by the Defendants and is (theoretically) redressable by an action of this Court, without regard to the fact that XPV is no longer a going concern.[12]

### B.   XPV's Claims Must Be Dismissed In Their Entirety

Nevertheless, as mentioned, when the Court considers the merits of XPV's claims in light of the allegations in Plaintiffs' complaint, the Court concludes that XPV's claims must be dismissed in their entirety.  As explained below, in the instant action XPV makes five claims against two different groups of defendants:  it argues that it is due injunctive relief from the Official Capacity Defendants because their actions violated XPV's Fifth Amendment right to due process (Claim 1) and equal protection (Claim 3) and because the Official Capacity Defendants' denial of XPV's ATVM loan application was arbitrary and capricious in violation of the APA (Claim 5).  XPV also argues that it is entitled to monetary damages from the Individual Capacity Defendants for these due process (Claim 2) and equal protection (Claim 4) violations.  This Court has determined, however, that XPV does not have the capacity to sue the Official Capacity Defendants for injunctive relief, and that there is no *Bivens* action that permits monetary damages to be recovered from the Individual Capacity Defendants for the alleged constitutional violations under the circumstances presented here.  Therefore, all of XPV's claims in this action must be dismissed.

---

[12] This Court will address Defendants' capacity argument as part of its evaluation of the other Rule 12(b)(6) arguments that Defendants' have raised in their motions to dismiss.  *See infra* Part III.B.1.

1.  <u>XPV Does Not Have The Capacity To Sue For Injunctive Relief</u>

The Official Capacity Defendants argue that XPV cannot obtain the injunctive relief it seeks from them because, as a dissolved corporation, XPV can only sue for purposes of "winding up" its business operations, and it is not in a position to receive the relief of reconsideration or approval of its ATVM loan application as if it were operating as a going concern.  (*See* Off. Defs.' Mem. at 28.)  This Court agrees with Defendants.

Federal Rule of Civil Procedure 17 governs a party's capacity to sue or be sued, and applies to dissolved corporations.  *See Ripalda v. Am. Operations Corp.*, 977 F.2d 1464, 1468 (D.C. Cir. 1992).  Rule 17(b)(2) dictates that a corporation's capacity to sue is determined "by the law under which it was organized[,]" Fed. R. Civ. P. 17(b)(2); thus, because XPV was incorporated in California (*see* Am. Compl. ¶ 1), its capacity to sue as a dissolved corporation is controlled by California law.  Notably, under California law, "the effect of dissolution is not so much a change in the corporation's status as a change in its permitted scope of activity."  *Penasquitos, Inc. v. Superior Court*, 812 P.2d 154, 160 (Cal. 1991).  California Corporations Code section 2010 states that a dissolved corporation "continues to exist for the purpose of winding up its affairs, [and] prosecuting and defending actions by or against it . . . *but not for the purpose of continuing business except so far as necessary for the winding up thereof*."  Cal. Corp. Code § 2010(a) (emphasis added).  "Winding up" involves paying or making provision for the payment of debts; distributing remaining assets to shareholders; and filing a certificate of dissolution.  *See Trahan v. Trahan*, 120 Cal. Rptr. 2d 814, 821 (Cal. Ct. App. 2002).  Consequently, the key question here is whether or not the injunctive relief that XPV has requested in the instant action is "necessary for the

winding up" of its operations.  *See* Cal. Corp. Code § 2010(a).  (*See also* Pls.' Off.

Opp'n at 16–17 (citing the California code law).)

From the allegations of the complaint, it appears that, quite to the contrary, XPV

has brought the claims for injunctive relief in the instant action for the purpose of

restarting—in effect, *revitalizing*—its business operations, rather than winding them up.

Specifically, XPV seeks an injunction to require the DOE to reconsider and/or grant

XPV's loan application (Am. Compl. at 33) and, as noted at the outset, the ATVM Loan

Program grants loans to businesses for a very specific purpose: for the *future*

development and manufacture of advanced technology vehicles and certain components

of those vehicles, *see* 42 U.S.C. § 17013(d)(1).  Thus, if this Court orders the DOE to

reconsider XPV's loan application, or orders the DOE to grant the application as XPV

requests, XPV would have to restart its operations to comply with the terms of any

resulting ATVM loan.  This means that the relief XPV seeks here would necessarily

support the *continuation* of its operations, and is thus plainly contrary to section 2010's

express limitation on a dissolved corporation's right to sue.  *See Boyle v. Lakeview*

*Creamery Co.*, 68 P.2d 968, 970 (Cal. 1937) (noting that this provision's "only purpose

. . . is to stop further doing of business as a going concern, and limit corporate activities

to winding up").

Similar circumstances arose in the case of *Catalina Investments, Inc. v. Jones*,

119 Cal. Rptr. 2d 256 (2002).  In *Catalina Investments*, a dissolved corporation filed

suit seeking a writ of mandamus to compel California's Secretary of State to reinstate

the corporation as a going concern.  *Id.* at 258–59.  The California Court of Appeal held

that California law only permits a dissolved corporation to sue for purposes of winding

up its affairs, *id.* at 260–61, and to the extent that the corporation in that case was suing not to wind up but to reinstate its corporate existence, it lacked the capacity to sue, *id.* So it is here.  XPV has brought claims against the Official Capacity Defendants to secure an injunction requiring the consideration and granting of a loan application that would, ultimately, serve to reactivate XPV's dissolved business concern.  Although XPV may be correct that "winding up" activities under California law includes lawsuits "for injuries arising before dissolution[,]" (Pls.' Off. Opp'n at 16), Plaintiffs have not provided any case in which a dissolved corporation has been granted *injunctive* relief for such injuries—as opposed to monetary damages—much less a case that holds that, under California law, courts are permitted to grant injunctions that have the effect of reviving a dissolved business rather than shutting it down.

XPV's argument that the relief it seeks is not really about restarting its business because XPV could immediately *assign* to a third party any potential ATVM loan it receives pursuant to the Court's injunction, and thus accepting the loan would not necessarily violate section 2010 (*see* Pls.' Off. Opp'n at 17), is doubly flawed.  First, given the nature of ATVM loans and the fact that any assignment would require prior written approval of both the DOE and the (non-party) Federal Financing Bank, *see* 10 C.F.R. § 611.110, an ATVM loan provided to XPV by the DOE pursuant to an order of the Court may not, in fact, be assignable.  Moreover, and in any event, in the absence of any allegations of fact regarding how the dissolved company would utilize the assignment proceeds, the possibility of assignment does not in itself satisfy the requirement that the dissolved company's lawsuit be "necessary for the winding up" of its operations, Cal. Corp. Code § 2010(a), and Plaintiffs have made no such allegations

42

in this case; indeed, Plaintiffs have failed to identify any connection whatsoever between the relief it seeks in this lawsuit and XPV's process of winding up.

Accordingly, this Court concludes that, under California law, XPV lacks the capacity to sue the Official Capacity Defendants to obtain the reconsideration and granting of its ATVM loan application (*i.e.*, the injunctive relief it seeks). Consequently, XPV's interest in Claims 1 and 3 of Plaintiff's complaint (*i.e.*, XPV's due process and equal protection claims against the Official Capacity Defendants) and also Claim 5 of the complaint (XPV's APA claim) must be dismissed.

      2.  <u>Plaintiffs' Claims Against The Individual Capacity Defendants Fail As A Matter Of Law Because There Is No *Bivens* Action</u>

XPV's constitutional claims against the Individual Capacity Defendants fare no better than its claims for injunctive relief brought against the Official Capacity Defendants because, as the Individual Capacity Defendants point out and as explained fully below, no cause of action exists that would permit the recovery of monetary damages from the Individual Capacity Defendants due to the constitutional violations that Plaintiffs allege.  (Indiv. Defs.' Mot. at 29–31.)

Although Plaintiffs do not say so expressly in their complaint, by filing claims for monetary damages against the Individual Capacity Defendants based on those officials' alleged violation of Plaintiffs' constitutional rights, Plaintiffs are seeking to maintain a *Bivens* action—that is, an implied cause of action for damages as a result of constitutional violations by federal government officials.  *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 395–97 (1971); *see also Patterson v. United States*, 999 F. Supp. 2d 300, 308 (D.D.C. 2013) (reciting the elements of a *Bivens* action: "(1) the defendant violated a federal constitutional right of

the plaintiff; (2) the right was clearly established; (3) the defendant was a federal actor

by virtue of acting under color of federal law; and (4) the defendant was personally

involved in the alleged violation" (citations omitted)).   However, it is well established

that a *Bivens* action is not available for each and every type of constitutional infraction.

*See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (explaining that the universe

of claims for which *Bivens* liability is available is limited, and that, for the past thirty

years, the Supreme Court has "consistently refused to extend *Bivens* liability to any new

context or new category of defendants").   To date, an implied private cause of action

has been recognized under the *Bivens* doctrine for the violation of certain constitutional

amendments—including the Fifth Amendment—under specified circumstances,

*Patterson*, 999 F. Supp. 2d at 308–09, but that does not mean that a *Bivens* action is

necessarily available for the particular Fifth Amendment violations that Plaintiffs allege

in the present case.   *See FDIC v. Meyer*, 510 U.S. 471, 484 n.9 (1994) ("[A] *Bivens*

action alleging a violation of the Due Process Clause of the Fifth Amendment may be

appropriate in some contexts, but not in others.");   *Wilson v. Libby*, 498 F. Supp. 2d 74,

86 (D.D.C. 2007) ("[I]t is not enough for [the] plaintiffs to point to cases recognizing

*Bivens* actions under the . . . Fifth Amendment[] generally."), *aff'd*, 535 F.3d 697 (D.C.

Cir. 2008).   And Plaintiffs have not identified (nor has this Court found) any case in

which a court recognizes an implied Fifth Amendment due process or equal protection

*Bivens* claim arising out of the denial of a federal loan application.[13]   Thus, when

---

[13] This is apparently not for lack of trying; indeed, Plaintiffs do point to one case—*Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964)—in which the plaintiff alleged that a city liquor board violated her Fourteenth Amendment right to procedural due process and equal protection by denying her application for a liquor license because of politically-motivated decision making. (*See* Pls.' Mem. in Opp'n to Indiv. Defs.' Mot. ("Pls.' Indiv. Opp'n"), ECF No. 29, at 23–24.) But *Hornsby* was a Section 1983 case, not a *Bivens* action; consequently, the action and the remedy existed by statute, and there was no

evaluating whether or not Plaintiffs have stated a claim against the Individual Capacity
Defendants as a matter of law, this Court must first determine whether a *Bivens* action
is even available given the facts alleged in Plaintiffs' complaint.

In making this determination, the Court must be cognizant of two circumstances
in which *Bivens* liability is ordinarily *not* extended: (1) if "any alternative, existing
process" provides good reason "to refrain from providing a new and freestanding
remedy in damages" (for example, if there is an alternative scheme for relief that makes
a *Bivens* action unnecessary), and (2) if there are "special factors counseling hesitation"
against extending a *Bivens* action to the new context. *Wilkie v. Robbins*, 551 U.S. 537,
550 (2007). With respect to the first of these circumstances, the Individual Capacity
Defendants argue that the APA provides an alternative, existing process by which
Plaintiffs can vindicate their rights (Indiv. Defs.' Mot. at 31), but this Court agrees with
Plaintiffs that the APA—whether viewed alone or in conjunction with another statute—
does not provide the sort of process that would preclude a *Bivens* action (Pls.' Mem. in
Opp'n to Indiv. Defs.' Mot. ("Pls.' Indiv. Opp'n"), ECF No. 29, at 25), because the
APA does not provide for monetary damages, *see* 5 U.S.C. § 702, and because it is
obviously directed toward *agency* action rather than the conduct of individual actors.
*See Minneci v. Pollard*, 132 S. Ct. 617, 625 (2012) (explaining that, to preclude a
*Bivens* action, the alternative scheme must "provide roughly similar incentives for
potential defendants to comply with the [Constitution] while also providing roughly
similar compensation to victims of violations"); *see also Carlson v. Green*, 446 U.S. 14,
21 (1980) (noting that "[i]t is almost axiomatic that the threat of damages has a

---

question about whether the cause of action should be implied.

deterrent effect," and emphasizing that statutes that are focused on agency misconduct create different incentives against constitutional violations than a *Bivens* action, which is "recoverable against individuals" and thus "is a more effective deterrent" with respect to such individuals).

Be that as it may, in this Court's view, Plaintiffs' bid to extend *Bivens* to the constitutional claims they seek to bring against the Individual Capacity Defendants clearly falters on the second of the established grounds—because there are at least two "special factors" that convince this Court that a *Bivens* action should not be made available under the circumstances presented here. *See Munsell v. Dep't of Agric.*, 509 F.3d 572, 591 (D.C. Cir. 2007) (stating that the second step in determining whether a *Bivens* action should be permitted involves engaging in a "'familiar' common-law balancing test, paying special heed to 'special factors counseling hesitation.'" (quoting *Wilkie*, 551 U.S. at 550)). First, a *Bivens* action is considered inappropriate "where Congress has adopted a comprehensive remedial scheme." *Davis v. Billington*, 681 F.3d 377, 381 (D.C. Cir. 2012) (internal quotation marks and citation omitted).[14] The APA authorizes a litigant to challenge "arbitrary and capricious" agency action as well as agency action that is "contrary to constitutional right, power, privilege, or immunity[,]" 5 U.S.C. § 706(2), and it contains "generous review provisions" that "serv[e] a broadly remedial purpose." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150,

---

[14] This factor is similar to, but less strict than, the first step of the *Bivens* analysis. Unlike the sort of "alternative, existing process" necessary to satisfy the first step, *Wilkie*, 551 U.S. at 550, the type of scheme considered under this special factor need not create the same sort of incentives or offer the same sort of relief as a *Bivens* action, *see, e.g.*, *Schweiker v. Chilicky*, 487 U.S. 412, 417–18 (1988) (finding that relief afforded by Social Security Act is a special factor that counsels against extending *Bivens* to wrongful withholding of benefits claim); *Bush v. Lucas*, 462 U.S. 367, 388–89 (1983) (finding that relief afforded by Civil Service Reform Act is a special factor that counsels against extending *Bivens* to a First Amendment violation in the federal employment context).

156 (1970).  To be sure, the APA itself does not create substantive rights, *see Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009), *aff'd sub nom.*, *Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011), but, here, those substantive rights emerge from the EISA and relevant regulations, and through a combination of the APA and the EISA, Plaintiffs are permitted to seek relief for any allegedly unconstitutional action taken by Defendants in the course of running the ATVM Loan Program.  Thus, when taken together, the APA and the substantive statutory and regulatory provisions that govern the ATVM Loan Program are plainly sufficient to constitute the sort of comprehensive remedial scheme that courts have found weighs against permitting a *Bivens* action to proceed.  *See Davis*, 681 F.3d. at 383 (noting that a comprehensive remedial scheme is one "that reflects a considered congressional judgment about which remedies should be available for claims that fall within its ambit"); *see also, e.g.*, *Miller v. U.S. Dep't of Agric. Farm Servs. Agency*, 143 F.3d 1413, 1416–17 (11th Cir. 1998) (finding government employee's *Bivens* action precluded by the availability of the APA); *Moore v. Glickman*, 113 F.3d 988, 994 (9th Cir. 1997) (same).[15]

---

[15] This Court does not, and need not, reach or resolve the question of whether the APA constitutes a "comprehensive remedial scheme" within the meaning of the "special factors" analysis *in the absence* of substantive statutory or regulatory provisions.  *See Munsell*, at 589–90 (casting doubt on the ability of the APA to displace a *Bivens* action on its own).  Defendants have argued that "the APA . . . *plus* the statutes and implementing regulations [with respect to the ATVM Loan Program] . . . preclude the application of *Bivens* remedy here" (Indiv. Defs.' Reply in Supp. of Indiv. Defs.' Mot., ECF No. 32, at 14), and that contention is the basis for the "special factor" determination here.  Moreover, with respect to the comprehensiveness of the statutory remedy, it is of no moment that the APA does not permit Plaintiffs to recover monetary damages from the Individual Capacity Defendants in addition to injunctive relief with respect to the agency's allegedly arbitrary conduct.  The D.C. Circuit has held that a comprehensive remedial scheme may counsel against recognizing a *Bivens* action even where that scheme deprives a plaintiff of *any* remedy.  *See Davis*, 681 F.3d at 386–88 (rejecting argument that the lack of any remedy with respect to a comprehensive scheme supports a *Bivens* action); *Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008) ("The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue."); *see also Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988) (en banc) (explaining that what matters is

Second, courts should be reluctant to allow a *Bivens* action to proceed where the precise scope of that action remains uncertain. *See Wilkie*, 551 U.S. at 560–61. In extending *Bivens*, a court must be mindful that it is essentially "fashion[ing] a new, judicially crafted cause of action[,]" *Malesko*, 534 U.S. at 68, and such a responsibility must be undertaken with caution because, otherwise, "the[re is a] reasonable fear that a general *Bivens* cure would be worse than the disease," *Wilkie*, 551 U.S. at 561 & n.11; *see also id.* at 561 n.11 (warning of dangers associated with *Bivens* actions where "the elements of a claim are so unclear that no one can tell in advance what claim might qualify or what might not"). In the Supreme Court's *Wilkie* case, for example, a plaintiff who was the owner and operator of a ranch in Wyoming alleged that federal employees of the Bureau of Land Management violated his Fifth Amendment rights by harassing him until he gave the government an easement. 551 U.S. at 543–47. In attempting to clarify the scope of the requested *Bivens* action, the Court was concerned about "the difficulty of devising a 'too much' standard that could guide an [agency] employee's conduct and a judicial factfinder's conclusion[,]" *id.* at 561, and it recognized that permitting an amorphous *Bivens* action "would invite claims in every sphere of legitimate governmental action affecting property interests, from negotiating tax claim settlements to enforcing Occupational Safety and Health Administration regulations[,]" *id.* And the Court openly struggled to identify any "limiting principle" with respect to the plaintiff's claim that would prevent such an outcome. *Id.* at 561 n.11.

---

"the comprehensiveness of the statutory scheme involved, not the adequacy of specific remedies extended thereunder" (internal quotation marks and citation omitted)).

The *Bivens* claims here, too, present "difficulty in defining a workable cause of action[,]" *id.* at 555, because they are grounded in amorphous allegations of political "cronyism" in the context of the administration of government loan programs.  (*See* Am. Compl. ¶¶ 137–41; 149–54.)  The precise contours of the proposed *Bivens* action are unclear—the requested Fifth Amendment action might relate only to a denial of a government loan on the alleged basis of impermissible political considerations, or it could cover a wide range of interactions between the government and private citizens in the context of government benefits and contracting—and Plaintiffs do not suggest a clear limiting principle.  In addition, there appears to be no obvious way to draw a line between official action that reflects legitimate and acceptable preferences in the political sphere and impermissible favoritism.  Consequently, the fact that this Court would have difficulty determining the precise scope of the implied cause of action that Plaintiffs seek to rely upon weighs heavily against recognizing a *Bivens* action under these circumstances.

The Court is not persuaded by Plaintiffs' arguments to the contrary—*i.e.*, Plaintiffs' contentions that the APA and EISA do not provide a comprehensive remedial scheme and that permitting a *Bivens* action would not overly expand the availability of such actions.  To the extent that Plaintiffs seek to rely on *Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d at 69–73, for the proposition that the APA is not the sort of comprehensive scheme that can preclude a *Bivens* action (*see* Pls.' Indiv. Opp'n at 25–26), that case does not compel this conclusion; at most, the *Navab-Safavi* court held that the APA *on its own* was not the sort of comprehensive remedial scheme that would constitute a special factor under the second step of the *Bivens* analysis, *see*

49

*Navab-Safavi*, 650 F. Supp. 2d at 71–73.  Moreover, although Plaintiffs struggle

mightily to persuade the Court that permitting a *Bivens* action "would not willy-nilly

trigger a flood of lawsuits for damages against any and all individual agency officials for

mere loan denials" (*id.* at 32), they have not provided any meaningful or practical guidance

regarding how to formulate a suitably narrow cause of action that could effectively avoid

this result.

    This Court also concludes that the outcome of the "special factors" analysis

above outweighs Plaintiffs' concern that a *Bivens* action might be the only avenue of

relief for XPV due to its dissolution.  (*See* Pls.' Indiv. Opp'n at 27–28.)  *See also*

*Munsell*, 509 F.3d at 591 (noting that the "special factors" part of the *Bivens* analysis

involves a "common-law balancing test").  The Supreme Court and the D.C. Circuit

have evaluated similar concerns, *see, e.g., Bivens*, 403 U.S. at 410 (Harlan, J.,

concurring) (noting that, for plaintiffs, "it [wa]s damages or nothing"), and have

consistently determined that, even when a remedial scheme provides *no* or only limited

relief to a plaintiff, if the scheme is comprehensive or if it would be difficult to craft a

workable *Bivens* action, such remedy should not be recognized, *see Davis*, 681 F.3d at

387–88 (finding that a comprehensive scheme can preclude a *Bivens* action even where

no damages are available to the plaintiff under that scheme); *Wilkie*, 551 U.S. at 561–62

(refusing to recognize a *Bivens* action despite the patent inadequacy of the plaintiff's

remedies).  Such is the case here.

    In the final analysis, then, this Court is not willing to find that a *Bivens* action is

available to permit the recovery of monetary damages against the Individual Capacity

Defendants on the grounds that those officials were motivated by political favoritism

with respect to their administration of government loan programs in a manner that

violated the Plaintiffs' constitutional rights.  Therefore, the constitutional claims
against the Individual Capacity Defendants must be dismissed as a matter of law.[16]

### C.  Limnia's Constitutional Claims Against The Official Capacity Defendants Must Be Dismissed, But Its APA Claims Can Proceed

What remains of the complaint at this point are the constitutional claims against
the Official Capacity Defendants with respect to Limnia's ATVM loan application
(Claims 1 and 3 regarding Limnia) and the contention that the DOE acted arbitrarily
and capriciously in violation of the APA when it processed Limnia's ATVM and LG
Program applications.[17]  Defendants argue that these constitutional and APA claims are
subject to dismissal under Rule 12(b)(6), for failure to state a claim upon which relief
can be granted.  (*See* Off. Defs.' Mem. at 30–33 (asserting that the complaint fails to
state a claim for a violation of Limnia's right to due process or equal protection); *id.* at
29–30 (asserting that Limnia's ATVM Loan Program APA claim must be dismissed for
failure to allege final agency action); *id.* at 33–35 (asserting that the complaint contains
insufficient allegations of arbitrary or capricious agency action with respect to the
DOE's rejection of Limnia's LG Program application).  As explained below, this Court
concludes that Limnia's due process and equal protection claims against the Official
Capacity Defendants must be dismissed because Limnia has no property interest in an
ATVM loan and because there was a rational basis for the DOE's denial of Limnia's
ATVM loan application.  However, the Court finds that Plaintiffs have stated a claim
for an APA violation with respect to the denial of Limnia's ATVM Loan Program and

---

[16] This Court's analysis of the *Bivens* claims applies to—and disposes of—*both* XPV's *and* Limnia's constitutional claims against the Individual Capacity Defendants (Claims 2 and 4).

[17] It appears from the complaint that Plaintiffs' constitutional challenge to Defendants' conduct extends only to Limnia's ATVM loan application, not Limnia's LG Program application.

LG Program applications, and thus, that Plaintiffs' case may proceed with respect to these two claims.

1.  <u>Plaintiffs' Due Process Claim Fails Because The Complaint Does Not Allege A Cognizable Property Interest</u>

A due process challenge such as the one Plaintiffs seek to advance here must be based on an allegation that the defendant "wrongfully deprive[d] a person of life, liberty, or property[.]" *Moses v. District of Columbia*, 741 F. Supp. 2d 123, 126 (D.D.C. 2010); *see also Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014). Plaintiffs' complaint asserts that the DOE denied Limnia's ATVM loan application in a manner that violated Limnia's right to due process; therefore, Plaintiffs' due process claim is premised on the assumption that Limnia has a constitutionally protected "property" interest in an ATVM loan. However, a government benefit (such as a government loan) can only qualify as a constitutionally protected property interest when a plaintiff has "more than an abstract need or desire and more than a unilateral expectation of it" and "instead, ha[s] a legitimate claim of entitlement to it." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks and citation omitted). Put another way, "when a statute leaves a benefit to the discretion of a government official, no protected property interest in that benefit can arise." *Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003).

It is clear on the facts as Plaintiffs have alleged them that an ATVM loan is not a protected property interest for due process purposes. Under the statute that establishes the ATVM Loan program and its operative regulations, no applicant has a "legitimate claim of entitlement" to such a loan, and in fact, the DOE plainly has considerable discretion with respect to both what selection criteria are to be applied and also which

particular applicants will be funded.  To be specific, the applicable statute plainly states that the DOE "shall select" successful applicants, 42 U.S.C. § 17013(d)(3); *see also* New Oxford Am. Dictionary 1536 (2nd ed. 2005) (defining "select" as "carefully choose as being the best or most suitable"), and it expressly provides that a loan application must be submitted "in such manner, and containing such information as the Secretary [of Energy] may require," 42 U.S.C. § 17013(d)(2).  Moreover, other than mandating that successful applicants be financially viable and be able to ensure that the funds will be spent appropriately, Congress has left the selection criteria almost entirely up to the DOE, specifying that applicants must satisfy "such other criteria as may be established and published by the Secretary [of Energy]." *Id.* § 17013(d)(3).

     The applicable regulations similarly indicate that the DOE has the discretion to choose who has met the selection criteria and who ultimately will be awarded a loan. *See* 10 C.F.R. §§ 611.100–611.112.  For example, during the eligibility screening stage of the loan process, the DOE evaluates whether an applicant meets all of the program requirements, including the requirement of financial viability, *see id.* § 611.100(a)(2), and although the regulations provide a list of considerations for the DOE in making the financial viability determination, they also state that the list is non-exhaustive, suggesting that the DOE may, in its discretion, consider *other* factors relevant to this determination, *see id.* § 611.100(c).  Similarly, the regulations provide a list of what must be included in the loan application itself, but they also make clear that an applicant must provide any "[o]ther information, as determined necessary by DOE." *Id.* § 611.101(o).  It is clear, then, that in addition to setting the eligibility requirements,

the DOE also has the authority to make case-by-case determinations as to whether the initial criteria have been satisfied.

The DOE exercises discretion with respect to the consideration of ATVM loan applications at the merits review stage as well.  The relevant provision of the application regulations lists a number of considerations that are taken into account as part of the merits review, but also states clearly that the merits review is "not limited to" those factors.  *Id.* § 611.103(b).  Moreover, many of the merits factors that are listed in the regulations require the DOE to exercise judgment and consider how an application fits within the broader purpose of the ATVM Loan Program.  For example, with respect to the ultimate award, the DOE may consider "diversity in technology, company, risk, and geographic location[,]" *id.* § 611.103(b)(2)—which suggests that the DOE may decline to approve a loan application even when the applicant has satisfied all of the technical requirements, if the DOE has already funded applicant project that uses the same type of technology or is located in the same geographic area.[18]

The bottom line is this: the relevant statutory and regulatory provisions establish that the DOE has the authority to make discretionary judgment calls and to move beyond strict technical requirements when assessing ATVM Loan applications at various stages in the application process.  Thus, the DOE has been granted the sort of discretion that prevents an ATVM loan from becoming the type of government entitlement that creates a property interest in an applicant.  *See Ferrone v. Onorato*, 298

---

[18] Of course, notwithstanding the fact that the DOE has broad discretion to administer the ATVM loan program by statute and thus applicants have no constitutionally protected property interest in receiving such a loan, the agency is not immune from a suit for injunctive relief that challenges its operation of the loan program.  Discretion or no, the DOE must act in a manner that is consistent with the requirements of the APA.  *See infra*, Part III.C.3.

F.App'x 138, 139–40 (3d Cir. 2008) (holding that no property interest arises from application for an economic development loan because the local government "had the discretion to grant or deny disbursement of funds"); *Snow Pallet, Inc. v. Clinton Cnty. Indus. Dev. Auth.*, 46 F.App'x 787, 791–92 (6th Cir. 2002) (affirming dismissal of a due process claim because no property interest arose out of the defendant's decision to reduce the amount received as a loan).

Plaintiffs appear to accept that the DOE has *some* discretion in administering the ATVM Loan Program, but they argue nevertheless that this discretion is "substantially limit[ed,]" such that a property interest still exist.  (Pls.' Indiv. Opp'n at 37–38.)  The "substantially limited" standard is derived from *George Washington University v. District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003), in which the D.C. Circuit noted that, "in the land use arena[,]" most due process cases involved either "virtually unlimited discretion" or "rather absolute entitlement[,]" *id.* at 207, and concluded that the exception to the zoning regulation at issue in that case fell closer to the absolute entitlement side (*i.e.*, government discretion was substantially limited) because, under the governing law, the exception plaintiff sought "*must* be issued as a matter of right if the qualifying criteria are met[,]" *id.* at 208 (emphasis added).  To the extent that *George Washington University* even applies outside of the land use context, the law at issue in that case clearly placed a far more severe restriction on government discretion than exists in the context of the ATVM Loan Program.  Here, the key statutory and regulatory provisions reveal that the DOE can refuse to grant a loan to an applicant who satisfies the enumerated requirements, and in fact, the DOE even has the ability to create additional eligibility requirements of its own.  Consequently, unlike the land use

plaintiffs, Limnia did not have a protected property interest in receiving a loan from the DOE within the meaning of a proper due process claim, and as a result, Limnia's due process claim against the Official Capacity Defendants (Claim 1) must be dismissed. *See, e.g.*, *Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 155 (D.D.C. 2011) (rejecting applicability of *George Washington University* where the existence of multiple "discretionary points . . . render[ed] any borrower's expectation and entitlement to a [loan] modification too uncertain to warrant protection under the Due Process Clause").

      2.  <u>The Official Capacity Defendants Have Offered A Rational Basis For The Denial Of Limnia's ATVM Loan Application</u>

Plaintiffs also fail to allege adequately that the denial of Limnia's ATVM loan application violated its Fifth Amendment right to equal protection (Claim 3).

The Fifth Amendment's guarantee of equal protection "requires state actors to treat similarly situated persons alike." *Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 126 (D.D.C. 2012). Although a typical equal protection claim involves a claim that the government is impermissibly discriminating against a particular group, *see Bell v. Duperrault*, 367 F.3d 703, 709 (7th Cir. 2004) (Posner, J., concurring) (describing the "usual equal protection case"), there is another type of equal protection claim that is known as a "class of one" claim, *see Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 122 (D.D.C. 2012), which is the kind of equal protection claim that Plaintiffs seek to advance here (Pls.' Indiv. Opp'n at 42). A "class of one" equal protection claim may be maintained "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per

curiam); *see also 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075

(D.C. Cir. 2003) (holding that there are "two essential elements of [a] 'class of one'

equal protection claim: (1) disparate treatment of similarly situated parties (2) on no

rational basis.").  The first requirement—that there be another party that is similarly

situated to the plaintiff—"is not a mere formality[; r]ather, it serves to distinguish

claims to [obtain] the treatment that was afforded others, which can be cognizable under

principles of equal protection, from bare complaints of governmental unfairness, which

cannot." *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013).  Moreover,

there is a "presumption of rationality" that applies whenever rational basis review is the

operative standard, *id.*, and in order to overcome it, a plaintiff must "negative any

reasonably conceivable state of facts that could provide a rational basis for the

classification[,]" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001)

(internal quotation marks and citation omitted).  In effect, this means that the rational

basis inquiry is "highly deferential" to the government, *Dixon*, 666 F.3d at 1342, and

that an equal protection claim fails under Rule 12(b)(6) if the complaint itself suggests

a rational basis for the government action, *see Miller v. City of Monona*, 784 F.3d 1113,

1121 (7th Cir. 2015) ("[I]t is possible for plaintiffs to plead themselves out of court if

their complaint reveals a potential rational basis for the actions of local officials."); *see*

*also Jackson v. Vill. of W. Springs*, No. 14-3641, 2015 WL 2262703, at *4 (7th Cir.

May 15, 2015) ("[E]ven at the pleading stage a class-of-one plaintiff must negate any

reasonably conceivable state of facts that could provide a rational basis." (internal

quotation marks and citation omitted)); *cf. Sparrow v. United Air Lines, Inc.*, 216 F.3d

1111, 1116 (D.C. Cir. 2000) ("In some cases, it is possible for a plaintiff to plead too

much: that is, to plead himself out of court by alleging facts that render success on the merits impossible.").

In the complaint at issue here, Plaintiffs assert that Limnia was treated differently from "similarly[-]situated . . . crony companies like Tesla and Fisker" because its ATVM loan application was denied despite being "equally as qualified to receive ATVM Loan Program funds[.]" (Am. Compl. ¶ 144.)  Furthermore, according to the complaint, the DOE's ostensible reason for denying Limnia's loan application was "mere pretext to preserve ATVM Loan Program funds for government-favored companies and/or to protect those companies from competition." (Am. Compl. ¶ 69.) The first of these assertions—that Limnia's ATVM loan application was equally as meritorious as the applications of Tesla and Fisker (*see* Am. Compl. ¶ 145)—must be accepted as true at this point in the litigation, *see Epps*, 719 F. Supp. 2d at 13, and this Court finds that (for the purpose of the motion to dismiss) it manifestly suffices to establish that Limnia is similarly situated to other ATVM loan applicants.

However, with respect to the rational basis prong of the equal protection inquiry, this Court concludes that Plaintiffs' contentions regarding the pretextual nature of the DOE's reasons for denying Limnia's application are not sufficient to support an inference that the DOE's decision was irrational.  Specifically, as alleged in the complaint, the DOE's purported reason for rejecting Limnia's ATVM loan application in 2009 was that the energy storage system Limnia was developing did not constitute a "qualifying component" under the terms of the EISA.  (*See* Ex. 6 to Am. Compl. at 24–25.)[19]  The EISA defines "qualifying components" as components that are "designed for

---

[19] Plaintiffs cite to, and directly quote from, this letter in the complaint.  (*See* Am. Compl. ¶ 69.)  The letter is also central to Plaintiffs' claim that the DOE's reasons for rejecting Limnia's ATVM loan

advanced technology vehicles; and . . . installed for the purpose of meeting the performance requirements of advanced technology vehicles." 42 U.S.C. § 17013(a)(4). According to the DOE, Limnia's energy storage system did not satisfy this definition because it appeared to be "a stand alone recharging station" that was not "designed for installation in an advanced technology vehicle" as required by the EISA (*see* Ex. 6 to Am. Compl. at 25), and this explanation for rejecting Limnia's application is plainly enough to survive rational basis review. Moreover, and significantly, it appears that *even if the DOE was wrong about what the statute means or what Limnia's product does*, the agency's otherwise rational decision would still pass constitutional muster. *See Highway Materials, Inc. v. Whitemarsh Twp.*, 386 F. App'x 251, 259–60 (3d Cir. 2010) (holding that a township's incorrect interpretation of its own ordinances "is not material to [the plaintiff's] equal protection claim"); *Izquierdo Prieto v. Mercado Rosa*, 894 F.2d 467, 471 (1st Cir. 1990) (noting that the central question on rational basis review is not whether the governmental action "was right or wrong but whether some rational basis for it can be discerned").

This would normally be the end of the analysis—the DOE articulated a rational explanation for its action ergo there can be no equal protection claim. *See Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (dismissing equal protection claim upon finding that there was a rational basis). Plaintiffs allege, however, that the reason the DOE provided for the agency's rejection of the Limnia's application is not the *real* reason, and instead, is a mere pretext. (*See* Am. Compl. ¶ 69; *see also* Pls.' Indiv.

---

application (as contained in that letter) are pretextual. (*See id.*)  This Court is therefore permitted to consider the letter "without converting the motion to dismiss to a motion for summary judgment." *Langer v. George Washington Univ.*, 498 F. Supp. 2d 196, 202 n.1 (D.D.C. 2007).

Opp'n at 43 ("Defendants' explanations cannot satisfy rational basis review since they are nothing more than post hoc rationalizations." (citations omitted)).)  The D.C. Circuit has not yet addressed the issue of the impact of a pretext allegation on the rational basis analysis, and other circuits are divided regarding whether or not an allegation of pretext in the context of a "class of one" equal protection claim is sufficient to render an otherwise rational decision irrational.  The Ninth Circuit has held that a pretext contention may suffice to overcome an asserted rational basis where a plaintiff alleges that she has been treated differently from similarly situated parties. *See Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004); *see also Fortress Bible Church v. Feiner*, 694 F.3d 208, 224 (2d Cir. 2012) (finding that a conclusion of no rational basis is "bolstered where . . . the evidence demonstrates that the government's stated concerns were pretextual").  By contrast, the Third, Seventh, and Tenth Circuits have held that pretext allegations are irrelevant, so long as the proffered basis for the decision is rational.  *See Highway Materials, Inc.*, 386 F. App'x at 260 (finding allegation of pretext insufficient to establish equal protection violation); *Jicarilla Apache Nation v. Rio Arriba Cnty.*, 440 F.3d 1202, 1211 (10th Cir. 2006) ("Because a class-of-one plaintiff must show that the official action was *objectively* irrational and abusive, however, pretext is not an issue."); *Smith v. City of Chicago*, 457 F.3d 643, 651 (7th Cir. 2006) (rejecting argument that lack of rational basis can be established by proof of pretext).

This Court finds that the Third, Seventh, and Tenth Circuits have the better of the argument in light of existing law, and thus that a pretext allegation alone is not sufficient to undermine an otherwise rational basis for government conduct in the

context of a "class of one" equal protection claim. The Court's conclusion in this
regard is based primarily on the fact that there is no indication that the Supreme Court
intended a "class of one" equal protection claim to be a departure from more typical
equal protection claims, and in fact, it appears to be merely another "application" of
"the principle that the Equal Protection Clause is concerned with arbitrary government
classification[.]" *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008). In
traditional equal protection contexts, the subjective motivations of the government actor
are not considered. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)
("[B]ecause we never require a legislature to articulate its reasons for enacting a statute,
it is entirely irrelevant for constitutional purposes whether the conceived reason for the
challenged distinction actually motivated the legislature."); *Women Involved in Farm
Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994, 1005 (D.C. Cir. 1989) ("Ordinarily, there is
no necessity in rational-basis scrutiny for a separate inquiry into the legislature's *actual*
motivation, for the legislature's subjective motivation does not undermine a
classification's validity provided legitimate motivations are conceivable." (emphasis in
original)). And refusing to credit allegations that the government's actual motivation
was something other than the articulated basis when conducting rational basis review of
"class of one" claims is also consistent with the principle that even unstated bases for
government distinctions—and/or bases that the government did not actually rely upon—
satisfy the Equal Protection Clause if they are rational. *See Waters v. Rumsfeld*, 320
F.3d 265, 269 (D.C. Cir. 2003); *Mitchell v. Yates*, 402 F. Supp. 2d 222, 232 (D.D.C.
2005).[20]

---

[20] Where the government otherwise asserts a rational basis for its conduct, it appears that the only
circumstances in which pretext assertions are routinely deemed relevant are when a plaintiff alleges

Applying these principles here, this Court concludes that Plaintiffs' pretext contention does not negate the otherwise rational basis that exists for the denial of Limnia's ATVM application. That is, even if Plaintiffs are correct that the real impetus behind the DOE's decision to reject Limnia's ATVM loan application was the Defendants' desire to "preserve ATVM Loan Program funds for government-favored companies and/or to protect those companies from competition" (Am. Compl. ¶ 69), this motivation does not implicate a suspect classification or demonstrate intentional discriminatory animus towards ATVM applicants that lacked political connections, and therefore it does not overcome the rationality of the explanation the government has provided for the purpose of the Court's equal protection analysis.[21]

Accordingly, the complaint in this case does not contain sufficient allegations to make plausible Plaintiffs' contention that, with respect to the DOE's administration of the ATVM Loan Program, Limnia was similarly situated to another party who was treated differently, and that there was no rational basis for this differential treatment. *See 3883 Connecticut LLC*, 336 F.3d at 1075. Thus, Limnia's equal protection claim against the Official Capacity Defendants (Claim 3) must be dismissed.

---

that the true reason for the government action triggers heightened scrutiny, *see, e.g.*, *Hernandez v. New York*, 500 U.S. 352, 363 (1991) (accepting evidence that peremptory challenges were actually race-based); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979) (addressing and rejecting a claim that a statute giving hiring preference to veterans was "a pretext for gender discrimination"), or when there is evidence that discriminatory animus infected a particular government action, *see, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (rejecting city's justification for imposing stricter permit requirements for housing for those with intellectually disabilities because the requirement was based upon "irrational prejudice"). No such allegations have been made in the instant case.

[21] *See supra* n.20.

3.  <u>Plaintiffs Have Stated A Claim Under The APA With Respect To The DOE's Denial Of Limnia's ATVM And LG Program Applications</u>

Finally, this Court concludes that the two remaining claims—the APA claims against the Official Capacity Defendants arising out of the DOE's denial of Limnia's ATVM loan application (Claim 6) and LG Program application (Claim 7)—can proceed because Plaintiffs' complaint adequately alleges the sort of arbitrary and capricious agency action that potentially justifies judicial review under the APA.  The APA authorizes judicial review of final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. §§ 704, 706.  To state a claim for arbitrary and capricious agency action under the APA, a plaintiff must allege that an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency also acts arbitrarily and capriciously if it fails to "treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).

Here, Plaintiffs claim that the DOE did not evaluate Limnia's ATVM loan application "in good faith and in accordance with [the] DOE's regulations, policies and promises."  (Am. Compl. ¶ 114.)  Instead, according to Plaintiffs, Limnia's application was sidelined in favor of those submitted by competitor companies with political connections.  (*See id.* ¶ 115.)  Moreover, Plaintiffs allege that when the DOE articulated

its reasons for rejecting Limnia's ATVM loan application, the agency's explanation was a "mere pretext to preserve ATVM Loan Program funds for government-favored companies and/or to protect those companies from competition." (Am. Compl. ¶ 69.) Taken as true, these allegations are sufficient to support Plaintiffs' contention that the DOE's decision with respect to Limnia's ATVM application was arbitrary and capricious because the DOE relied on impermissible considerations that ran counter to the evidence before it and the applicable regulations, and because Limnia was treated differently from other applicants without any legitimate justification.

The Official Capacity Defendants do not directly challenge the conclusion that the complaint sufficiently alleges arbitrary and capricious action on the part of the agency; rather, they contend that the complaint nevertheless fails to state and APA claim because that there has been no final agency action with respect to Limnia's ATVM loan application. (*See* Off. Defs.' Mem. at 29–30.) This Court has already addressed—and rejected—this argument in the context of the Official Capacity Defendants' objections to ripeness. *See supra* Part III.A.1. Therefore, the final agency action requirement imposes no impediment to the Court's conclusion that Plaintiffs' complaint states a claim under the APA regarding the DOE's treatment of Limnia's application for the ATVM Loan Program, and thus that Claim 6 can proceed.

A similar analysis pertains to Plaintiffs' APA claims regarding Limnia's LG Program application. Plaintiffs allege that the DOE twice reneged on promises made to Limnia related to the submission of its LG Program application—first, by promising to waive an application fee and then demanding payment of that fee, and second by promising to give Limnia information about how to rectify this deficiency but then not

providing that information—and that these failed promises resulted in the rejection of Limnia's LG Program application.  (*See* Am. Compl. ¶ 118(j).)  Although Plaintiffs refer in passing to political favoritism in the context of the LG Program (*see, e.g.*, Am. Compl. ¶¶ 116, 119), the real focus appears to be on the alleged inconsistency of the LG Program application process (*see* Pls.' Off. Opp'n at 36).  Plaintiffs' fact-based contention that the LG Program was run in an ad hoc manner is sufficient to state a claim under the APA for arbitrary and capricious agency action.  *See Indep. Petroleum Ass'n of Am.*, 92 F.3d at 1258.

The Official Capacity Defendants rail against the conclusion that the complaint adequately alleges a violation of the APA because, in Defendants' view, the allegations in the complaint make clear that the DOE denied Limnia's LG Program application for a legitimate reason: Limnia had failed to pay the required application fee.  (*See* Pls.' Off. Opp'n at 33–35.)  Defendants argue that, even if Secretary Chu made an oral statement waiving the LG Program's application fee, DOE's regulations make clear that the DOE is not bound by oral representations in connection with applications for LG Program backing (*see id.* at 34); *see also* 10 C.F.R. § 609.10(b), and therefore the DOE's decision to enforce that fee provision cannot be arbitrary and capricious, regardless of any oral statements that were made.  But this argument homes in on only *one* aspect of Limnia's multifaceted APA claim—the assertion that the DOE acted arbitrarily in requiring an application fee when it previously indicated that such a fee would be waived (*see* Am. Compl. ¶¶ 76–78)—and thus construes Plaintiffs' claim too narrowly.  In addition to the allegations regarding Secretary Chu's statements waiving the LG Program application fee and the DOE's subsequent refusal to honor that

promise, Plaintiffs also allege that the DOE only notified Limnia that their application was deficient on the day the application was due, rendering it impossible to rectify any deficiencies by the deadline.  (*Id.* ¶¶ 78–79.)  Then, the day after the deadline, a DOE representative allegedly told Limnia that it may still be possible to pay the application fee and have its application considered notwithstanding the passage of the deadline, and that agency agent allegedly promised to provide wire instructions.  (*Id.* ¶ 80.)  Limnia alleges that when it attempted to follow up on this communication, the DOE simply did not respond, and that Limnia's application was rejected shortly thereafter.  (*Id.* ¶ 81.)

Thus, even if the DOE's enforcement of the fee requirement (and thus its failure to abide by Secretary Chu's promise to waive the application fee) cannot be considered "arbitrary" in light of applicable regulations, that allegation alone does not capture the full thrust of Limnia's APA claim—the real gravamen of the Plaintiffs' allegations with respect to the DOE's administration of the LG Program is that Secretary Chu "operated [the LG] program on the fly, and the [DOE] made up the rules as it moved through the loan award process."  (Pls.' Off. Opp'n at 36; *see also* Am. Compl. ¶ 111 (claiming that the GAO LG Program Report "found that DOE treated LGP applicants inconsistently, favoring some and disadvantaging others; lacked systematic mechanisms for LGP applicants to administratively appeal adverse decisions; often ignored its own underwriting standards and skipped review steps; and re-reviewed rejected applications on an ad hoc basis").)  And, as noted above, allegations of this kind are sufficient to state a claim for a violation of the APA.

## IV.    CONCLUSION

As set forth in the accompanying order, the Official Capacity Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, and the Individual Capacity Defendants' motion to dismiss is **GRANTED** in full.  This Court finds that there are no jurisdictional obstacles preventing consideration of Plaintiffs' claims on the merits; however, all of the claims brought by XPV and most of the claims brought by Limnia nevertheless must be dismissed.  XPV's constitutional and APA claims against the Official Capacity Defendants—each of which seeks injunctive relief—must be dismissed because, as a dissolved corporation, XPV lacks the capacity to sue for such relief.  Furthermore, neither XPV nor Limnia can maintain their claims against the Individual Capacity Defendants because there is no implied cause of action for monetary damages arising from the allegedly unconstitutional conduct of individual officials under the circumstances alleged here.  Plaintiffs' constitutional claims against the Official Capacity Defendants with respect to Limnia's ATVM loan application must also be dismissed because the complaint fails to state a claim for any due process or equal protection violation.  However, for the reasons provided above, Plaintiffs have made sufficient allegations to support plausible APA claims arising out of the denial of Limnia's ATVM loan application and LG Program application, and thus, those claims may proceed.

DATE:  July 14, 2015                        *Ketanji Brown Jackson*
                                           KETANJI BROWN JACKSON
                                           United States District Judge